OPINION
{¶ 1} Appellants, Tiffany White ("White"), Kristopher Currenton ("Currenton"), and Roddell Fuqua ("Fuqua"), have appealed from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, that terminated parental rights and awarded custody of their minor children to Franklin County Children Services ("FCCS") for the purpose of adoption. Appellant, Erika Woods ("Woods"), the childrens' maternal aunt, has appealed from the trial court's denial of her motion for legal custody. For the following reasons, we affirm.
 {¶ 2} White is the natural mother of seven living children ("the children"): C.C., born on July 27, 1987; R.F., born on September 11, 1992; S.F., born on November 8, 1993; T.F., born on September 28, 1994; E.C., born on November 2, 1995; D.S., born on August 15, 1997; and K.S., born on July 27, 1999.[1] Fuqua is the father of R.F., S.F., and T.F., Currenton is the father of C.C., E.C., and Kristopher Smith ("Smith") is the father of K.S. and D.S.
 {¶ 3} In December 1998, FCCS opened a file on this family due to a sibling,[2] born with cerebral palsy and extreme retardation, being placed in long-term foster care in Jefferson County, Ohio. On June 3, 1999, complaints were filed alleging the children were neglected and dependent. According to FCCS, White left the children in the unsupervised care of Toby Smith, a maternal cousin, after allegations that Toby Smith had sexually abused R.F. had been substantiated. As a result, the children, with the exception of K.S., who was not yet born, were removed from White's care on June 3, 1999, and placed in the care of Beth Allen, a paternal grandmother. On June 14, 1999, the children were then placed in foster care. FCCS further alleged White had a history with Jefferson County CSB of leaving the children with relatives for unspecified periods of time, and with multiple sitters who had no knowledge of her return.
 {¶ 4} A guardian ad litem was appointed to represent the children. Attorneys were appointed for Fuqua and Currenton, both of whom were incarcerated, and Smith, who did not wish to be involved with FCCS. After an adjudication of dependency on July 29, 1999, the court granted temporary custody of the children to FCCS. FCCS adopted a reunification case plan that required White to address various areas of concern, including domestic violence issues, particularly concerning her history of involvement with abusive and violent men, cooperate with a drug and alcohol assessment and undergo random drug screens, attend parenting classes, learn how to properly supervise her children, complete a psychological evaluation and counseling, and provide a safe and stable home environment.
 {¶ 5} On October 26, 2000, FCCS filed a motion for permanent custody of the children (excluding K.S.) pursuant to R.C. 2151.413. Incorporated in the motion was the affidavit of Jennifer Butler ("Butler"), the FCCS social worker assigned to the family, who stated that White "failed continuously and repeatedly to substantially change the conditions" that caused the children to be removed from her care, and failed to make progress on her case plan. (Affidavit of Jennifer Butler, at ¶ 5.) Butler also stated that White displayed "an unwillingness to provide an adequate permanent home for the children," as evidenced by her cohabitation with Steve White, who had been released from prison in January 2000, and had a criminal history of sexual battery. Id. Though the record is somewhat unclear, it appears that K.S. was removed from White's custody at around this time because she left K.S. in the unsupervised care of Steve White while she went to work. (Complaint filed on July 11, 2003, in case No. 03JU10772.) On July 11, 2003, FCCS re-filed its complaint seeking permanent custody of K.S. on the grounds that she was an abused, neglected, and dependent child.
 {¶ 6} After several continuances, an adjudicatory hearing on FCCS' motion for permanent custody commenced on June 2, 2003, and spanned several days: June 4, 2003, July 7, 2003, September 22-25, 2003, and November 4, 2003. On the first day of trial, Smith, represented by counsel, knowingly and voluntarily admitted that he did not work on the case plan and formally withdrew from the proceedings. The trial court heard testimony from White, Fuqua, and Currenton, who each testified on their own behalf, and FCCS presented the testimony of Mary Spain ("Spain"), the children's therapist, Chiun Kim ("Kim"), the FCCS caseworker, and Erin K. Givens, Esq. ("Givens"), the children's guardian ad litem. At the conclusion of the trial, FCCS, based upon Given's recommendation, orally moved to amend its motion of permanent custody for a planned permanent living arrangement for C.C. No party objected to the motion, which the trial court granted.
 {¶ 7} After considering the evidence adduced at trial, the trial court issued a decision on December 10, 2003, finding clear and convincing evidence that placing the children in the permanent custody of FCCS, and terminating the parental rights of White, Fuqua, and Currenton, were in the best interest of the children. On October 20, 2004, the trial court issued findings of fact in support of that decision. Therein, the trial court repeated its finding that permanent custody was in the best interest of each child, and explained:
The Court further finds that notwithstanding reasonable case planning and diligent efforts by FCCS to assist the parents to remedy the conditions that cause[d] the initial removal, the parents have failed continuously and repeatedly to remedy the conditions causing the removal. The court has carefully considered all of the services available to the parents and other material resources for the purpose of changing parental conduct to allow them to resume and maintain parental duties. Continuation in the children's own home is contrary to the children's welfare, and reasonable efforts have been made to prevent or eliminate the need for removal of the children from the home. It is in the best interest of each child that the Court grant the motion for permanent custody to FCCS.
The Court most particularly finds that Tiffany White has failed to complete her case plan, failed to protect her children from sexual abuse and exposure to domestic violence, and despite numerous attempts to assist her in remedying these conditions, she has failed to accept any responsibility for the abuse that occurred to her children.
The Court further finds that none of the fathers have supported any of these children. Christopher Smith never participated in the proceedings. Mr. Currenton and Mr. Fuqua were imprisoned at trial, and unlikely to be released for a significant period.
Regarding other placements with relatives, the Court finds it is not in any of the children's best interest to be placed with any relative or other person who has requested an award of legal custody for the reasons stated by the guardian ad litem.
(Decision and entry, Oct. 20, 2004, at 13.)
 {¶ 8} Post-trial motions were filed subsequent to the trial court's December 10, 2003, decision. On December 19, 2003, White and Fuqua filed a motion for new trial, and on July 13, 2004, White filed a joint motion for stay and visitation. A hearing was held on July 14, 2004, concerning all post-trial motions, and on August 18, 2004, the trial court issued a decision denying same.
 {¶ 9} Appellants White, Fuqua, Currenton, and Woods have appealed the trial court's order granting permanent custody of the children to FCCS. Wood assigns the following seven assignments of error:
FIRST ASSIGNMENT OF ERROR:
The Trial Court erred in denying the Motions of the Maternal Aunt forCustody.
SECOND ASSIGNMENT OF ERROR:
The Trial Court Erred in Ordering Permanent Commitment to theFranklin County Children's Services Because the Agency Failed to Prove its Case byClear and Convincing Evidence as required by O.R.C. Section 2151.414(B)(1).

THIRD ASSIGNMENT OF ERROR:
The Trial Court Erred in Ordering Permanent Commitment underO.R.C. Sections 2151.412 and 2151.414, Because they are Unconstitutional inPart.
FOURTH ASSIGNMENT OF ERROR:
The Trial Court Erred by Failing to Re-Appointing [sic] Counsel for theMinor Children after their Previous Attorney had Withdrawn and after aConflict between the Children's Wishes and the Guardian Ad Litem'sRecommendations Became Apparent, and this was Plain Error.
FIFTH ASSIGNMENT OF ERROR:
The Trial Court Erred in Ordering Permanent Commitment to FCCS, Wherethe Guardian had not Specifically Inquired of Each Child regardingwhether he or she wanted to Reside with their Maternal Aunt or Visit WithHer.
SIXTH ASSIGNMENT OF ERROR:
The Trial Court Erred in Failing to Grant Tiffany White's and RoddellFuqua's Motion for New Trial.
SEVENTH ASSIGNMENT OF ERROR:
Ms. Wood was denied Effective Assistance of Counsel under Stricklandv. Washington, Because 1) Trial Counsel's Performance Fell below anObjective Standard of Reasonableness; and 2) There is a ReasonableProbability that, but for her Trial Counsel's Errors, the Result of theProceeding Would have been Different in light of the totality of theevidence.
Fuqua assigns the following six assignments of error:
FIRST ASSIGNMENT OF ERROR:
Revised Code Section 2151.414(B)(1) is unconstitutional as it deprivesparents of their right to due process by failing to require a finding ofparental unfitness by clear and convincing evidence.
SECOND ASSIGNMENT OF ERROR:
It is a violation of the parent's right to due process for the court torevoke all parental visitation without a full hearing, and for the courtto leave visitation matters to the discretion of a psychologist.
THIRD ASSIGNMENT OF ERROR:
The court erred when it determined that the children could not be orshould not be returned to either parent in a reasonable period of time.This finding is against the manifest weight of the evidence.
FOURTH ASSIGNMENT OF ERROR:
The court erred by not requiring the GAL to see the interaction betweenthe parents and children prior to severing parental rights.
FIFTH ASSIGNMENT OF ERROR:
The court erred by allowing Suzanne Staciewicz to withdraw as counselfor the Fuqua children, specifically S.F. and T.F.
SIXTH ASSIGNMENT OF ERROR:
The court erred by failing to give custody to the aunt, Erika Woods, aless restrictive alternative to the granting of permanent custody.
Currenton assigns the following assignment of error:
The trial court erred in terminating the parental rights of EulisCurenton, also know (sic) as Eulis Currenton.
White[3] assigns the following six assignments of error:
FIRST ASSIGNMENT OF ERROR
The trial court erred when it failed to find that 2151.414 which allowsthe termination of parental rights if the child is in custody of 12 outof 22 months is unconstitutional.
SECOND ASSIGNMENT OF ERROR
The court erred in revoking Tiffany White's visitation withoutan adequate due process hearing.
THIRD ASSIGNMENT OF ERROR
The trial court erred in relying on hearsay in determining that theagency proved its case by clear and convincing evidence.
FOURTH ASSIGNMENT OF ERROR
The court erred when it determined that the children could notor should not be returned to their parent in a reasonable amountof time.
FIFTH ASSIGNMENT OF ERROR
The court erred in failing to grant a new trial.
SIXTH ASSIGNMENT OF ERROR
The court erred in failing [to] require that the guardian viewparents and children together before severing parental rights.
 {¶ 10} Though appellants' have assigned many of the same errors on appeal, not all of their assignments of error are identical. In the interest of clarity and for ease of discussion, we have addressed appellants' assignments of error according to the issues presented; each issue is discussed under a separate section heading. Appellants assigning error relating to a specific issue are identified in the beginning of each section, and when appropriate, referred to as appellants throughout that section. Each appellant's assignment of error disposed of by a particular section is identified in the closing paragraph of that section.
I.R.C. 2151.414(B)(1)(D) IS CONSTITUTIONAL.
 {¶ 11} White,[4] Fuqua, and Wood argue that R.C. 2151.414(B)(1)(d) is unconstitutional because the "12 out of 22" time limits in R.C. 2151.414(B)(1)(d) violate a parent's due process rights arising under theFourteenth Amendment to the United States Constitution and improperly presumes parental unfitness. This court, however, has recently rejected that argument and found R.C. 2151.414(B)(1)(d) to be constitutional. See, e.g., In re Abram, Franklin App. No. 04AP-220, 2004-Ohio-5435, at ¶ 12-13; In re Bray, Franklin App. No. 04AP-842, 2005-Ohio-1540; In reBrooks, Franklin App. No. 04AP-164, 2004-Ohio-3887. Other appellate districts have found likewise. See, e.g., In re Workman, Vinton App. No. 02CA574, 2003-Ohio-2220, at ¶ 39-40; In re Villaneuva/Hampton Children,
Stark App. No. 2004CA00120, 2004-Ohio-4609, at ¶ 12; In re Gomer,
Wyandot App. No. 16-03-19, 2004-Ohio-1723, at ¶ 31.
 {¶ 12} Given this court's prior precedent and the concurrence among other districts that have squarely addressed the issue, we find that R.C. 2151.414(B)(1)(d) is not unconstitutional on its face. Further, consistent with our reasoning in In re Brooks, supra, we do not find R.C. 2151.414(B)(1)(d) unconstitutional as applied in the present case.
 {¶ 13} Based on the foregoing, we overrule White's first assignment of error, Fuqua's first assignment of error, and Wood's third assignment of error.
II. TERMINATION OF PARENTAL VISITATION PRIOR TO AWARD OF PERMANENTCUSTODY.
 {¶ 14} White continued to have visitation with the children after FCCS filed its motion for permanent custody as there had not yet been any adjudication on that motion. On June 26, 2002, the trial court ordered that White's visitation with the children include overnight visits. There were three overnight visits in July, 2002, the last being from July 16, 2002, through July 18, 2002.
 {¶ 15} On July 23, 2002, FCCS filed a motion to terminate visitation. According to FCCS' motion, after the last overnight visit, several of the children reported that they had been abused. K.S. "reported that [her] mother had beaten her with a belt on her leg and in her private area." (FCCS' motion to terminate visitation, at 2.) S.F., E.C., and D.S. reported that they had been sexually abused by their cousin, Calvin Smith, who, according to FCCS, had "a history of sexually abusing the children in this family prior to their removal from their mother's care." Id. T.F. reported that he watched a movie titled "13 Ghosts" and could no longer use the bathroom with the door closed. Id. FCCS requested that White have no contact with her children during the pendency of its investigation because some of the children "expressed fear" that their mother would find out they reported these incidents. Id.
 {¶ 16} The magistrate suspended visitation on July 30, 2002,[5] and continued the matter until August 22, 2002; it was continued twice thereafter upon request from counsel. On November 4, 2002, the trial court considered the matter and issued an entry on November 15, 2002, reinstating White's visitation upon approval from the children's therapist (Spain), and on the condition that White not discuss the sexual abuse with her children. That entry was stamped a final appealable order, and the clerk of court sent notices to all counsel of record containing final appealable order language.
 {¶ 17} White and Fuqua argue that the magistrate violated their fundamental constitutional rights, as well as their right to due process, when it revoked White's parental visitation without conducting a full hearing. They also contend that the trial court erred when it reinstated visitation subject to approval from Spain. Neither appellant, however, cites to any Ohio authority in support of their arguments.
 {¶ 18} As an initial matter, the section of White's brief that contains the statement of the assignments of error presented for review indicates that she is appealing "Order 8/22/02" and "Order 11/13/02." (Corrected Appellate Brief of White, at 1.) These decisions, however, are not attached to White's appendix as required by Loc. R. 7(F), which mandates that "counsel shall include in the appendix copies of other materials which are essential to the determination of the assignments of error, such as the trial court decision and judgment entry * * *." Nor does White specifically reference either order in her brief. As for Fuqua, his brief is void of any reference to a specific order, nor are any orders attached thereto.
 {¶ 19} The record includes the trial court's entry of November 15, 2002, but does not contain an order of November 13, 2002. There is, however, an entry of November 13, 2003, which ruled on White's post-trial motion for revision of visitation orders filed on October 14, 2003. Despite the apparent incongruities between the dates of entries in the record and those identified in White's brief, the sum and substance of appellants' argument led FCCS to believe that appellants were appealing the magistrate's order of July 30, 2002, and the trial court's entry of November 15, 2002. Working under that assumption, FCCS argues that the appeal of these orders is untimely because they were final appealable orders, and appeals therefrom were not filed until 2004, two years later. FCCS also maintains that suspension of White's visitation was in the best interest of the children due to her history of improper supervision and inability to protect her children. It further contends that "it is common practice to stop visitation" during a criminal investigation. (Appellate Brief of FCCS, at 16.)
 {¶ 20} In her reply brief, White argues that "[t]he visitation order here was not a final appealable order, but an interim order, so no appeal lay until the final judgment on the PCC." (Reply Brief of Appellant White, at 4.) In addition, White did not correct FCCS' assumption that she was appealing the orders of July 30, 2002, and November 15, 2002, therefore, we will analyze appellants' argument as it relates to those orders.
 {¶ 21} App. R. 3(D) provides a notice of appeal "shall designate the judgment, order or part thereof appealed from." Interlocutory orders, however, are merged into the final judgment; thus, an appeal from the final judgment includes all interlocutory orders merged with it. Shafferv. Ohio Health Corp., Franklin App. No. 04AP-236, 2004-Ohio-6523, at ¶ 11-12, citing Kvinta v. Kvinta, Franklin App. No. 02AP-836, 2003-Ohio-2884, at ¶ 20, citing Bard v. Society Natl. Bank (Sept. 10, 1998), Franklin App. No. 97AP-1497. Herein, the order of July 30, 2002, did not dispose of the visitation issue, and therefore, it was interlocutory. Civ. R. 54(B);Shaffer, supra. It did, however, merge into the trial court's entry of November 15, 2002, which disposed of the matter and was stamped "final appealable order"; the notices sent out by the clerk of courts also contained final appealable order language.
 {¶ 22} The gravamen of appellants' argument is that the magistrate's termination of visitation, and the trial court's entry of November 15, 2002, reinstating visitation subject to certain conditions, affected their "fundamental rights" and "is what ultimately caused the PCC to occur." (Corrected Appellate Brief of White, at 15.) Thus, it would appear that appellants' argument supports FCCS' position that the November 15, 2002, entry was a final appealable order as defined in R.C. 2502.02(B)(1) (a "final" order is one that "affects a substantial right in an action that in effect determines the action and prevents a judgment.").
 {¶ 23} In Hempen v. Bailey, Hamilton App. Nos. C-040014, C-040479,2005-Ohio-3039, at ¶ 8, the First District Court of Appeals addressed whether an order suspending visitation was a final appealable order. It noted that the order suspending visitation "arguably affected a substantial right in a special proceeding," but reasoned that it was "also arguably interlocutory" because, unlike the case sub judice, it was "subject to further order of the court." Id. The Hempen court did not decide the issue, explaining:
All issues related to the order suspending visitation and the ensuing orders prior to the order reinstating visitation are now moot. The duty of a court of appeals is to decide controversies between parties by a judgment that can be carried into effect. An appellate court need not render an advisory opinion on a moot question or rule on a question of law that cannot affect matters at issue in a case. Thus, when, without the fault of either party, circumstances preclude an appellate court from granting effectual relief in a case, the mootness doctrine preludes consideration of those issues.
In this case, we can grant no relief to the Baileys from the order suspending visitation and the intervening two-year delay. We cannot give them the time back to spend with their daughter. The trial court has already granted them the relief they seek, which is the resumption of visitation. * * *
Id. at ¶ 9-10. (Citations omitted).
 {¶ 24} We reach the same conclusion here. The issue of whether the trial court's entry of November 15, 2002, was a final appealable order need not be decided because the mootness doctrine precludes our consideration of the visitation orders at issue. A moot case is one in which, "`a judgment upon some matter which, when rendered, for any reason cannot have any practical legal effect upon a then-existing controversy.'" In re Brown, Franklin App. Nos. 03AP-1205, 2005-Ohio-2425, at ¶ 15, quoting Grove City v. Clark, Franklin App. No. 01AP-1369, 2002-Ohio-4549, at ¶ 11, quoting Culver v. City of Warren (1948),84 Ohio App. 373, 393. Under the facts of this case, we can grant appellants no relief with respect to the visitation orders. As poignantly stated by the Hempen court, we cannot "give them back the time to spend with their [children]." Id. at ¶ 10. Moreover, because we affirm the trial court's award of permanent custody to FCCS, which terminates appellants' parental rights, including visitation, appellants herein no longer have a legal right to visitation. In addition, given the clear and convincing evidence found by the trial court discussed infra, Part IV, we are not persuaded by appellants' contention that the visitation orders "caused the PCC to occur." (Corrected Appellate Brief of White, at 15.)
 {¶ 25} Based on the foregoing, we find appellants' appeal of the visitation orders at issue to be moot. Accordingly, we overrule White's and Fuqua's second assignments of error.
III. THE TRIAL COURT DID NOT RELY UPON HEARSAY EVIDENCE.
 {¶ 26} White argues that the trial court committed plain error when it relied upon hearsay evidence to conclude that FCCS proved its case by clear and convincing evidence. White first contends that the trial court relied upon hearsay evidence when it concluded that several of her children had been sexually abused. She also asserts that it was plain error for the trial court to rely upon the caseworker's testimony regarding White's positive drug screens.
 {¶ 27} It is not clear why White has argued we should review the trial court's alleged reliance upon hearsay concerning the children's sexual abuse according to the plain error standard, as opposed to an abuse of discretion standard. Plain error is the applicable standard of review when a party fails to state a timely objection, Evid. R. 103(A)(1); Statev. Murphy (2001), 91 Ohio St.3d 516, 532. Under the plain error standard, we must first find error, "a deviation from a legal rule."Barnes, supra, at 27. Moreover, the error must be "obvious" and must have impacted the party's "substantial rights" by affecting the outcome of the trial. Id., citing State v. Sanders (2001), 92 Ohio St.3d 245, 257, citing State v. Keith (1997), 79 Ohio St.3d 514, 518. Conversely, an alleged error in the admission or exclusion of evidence is reviewed according to an abuse of discretion standard. Knowles v. The Ohio StateUniversity, Franklin App. No. 02AP-527, 2002-Ohio-6962, citing Staton v.Miami Univ. (Mar. 27, 2001), Franklin App. No. 00AP-410, citing State v.Hymore (1967), 9 Ohio St.2d 122, certiorari denied, Hymore v. Ohio
(1968), 390 U.S. 1024, 88 S.Ct. 1409; Schultz v. Schultz (Nov. 4, 1997), Franklin App. No. 97AP-594. In any event, as explained infra, we have determined there was no error under either standard.
 A. Evidence of Sexual Abuse. {¶ 28} White asserts "[t]here is no reliable evidence in the record regarding the events that occurred involving the sexual abuse of any of Tiffany White's children." (Corrected Appellate Brief of White, at 16.) According to White, although she testified at trial that she understood some of her children were raped by Calvin Smith (Tr. Trans. Sept. 22, 2003, at 38-40, 42), she now argues that her testimony had "no probative value at all because she was even [sic] never allowed to speak to [the children.]" (Corrected Appellate Brief of White, at 16.) White also contends that because FCCS did not file the trial transcript of Calvin Smith's criminal trial, and did not call S.F., E.C., and D.S. (the alleged sexual abuse victims) as witnesses to testify, "there is no bona fide evidence of any rape by Calvin in the record on this case." (Reply Brief of White, at 2.) White further criticizes the trial court's finding that she failed to accept any responsibility for the sexual abuses of her children because she did not have "any legal responsibility for what occurred." (Corrected Appellate Brief of White, at 18.)
 {¶ 29} FCCS argues that White has failed to demonstrate that the trial court relied upon inadmissible hearsay in determining S.F. and E.C. were sexually abused, and even if the trial court did consider such evidence, White has failed to demonstrate that she has been prejudiced by same. To that end, FCCS points out that White concedes in her brief that the trial court sustained "most of" the hearsay objections. (Appellate Brief of FCCS, at 16; Corrected Appellate Brief of White, at 16.) FCCS further argues that Spain's testimony was admissible evidence of the sexual abuse of many of the children.
 {¶ 30} FCCS is correct when it asserts that White has not pointed to specific places in the record where the trial court relied upon excluded evidence. White cites to several pages of transcript testimony in which she claims demonstrates evidentiary errors made by the trial court. After careful review of same, however, we find the transcript testimony cited by White belies her argument on appeal. We further find there is ample evidence in the record to support the trial court's factual determination that S.F., E.C., R.F., and T.F. were sexually abused.
 {¶ 31} During trial, White testified that she believed that a few of her children had been sexually abused by Calvin Smith. (Tr. Trans. Sept. 22, 2003, at 39, 42; Tr. Trans. Sept. 25, 2003, at 15.) She also testified that C.C. and R.F. were sexually abused by Toby Smith in 1999, when they were in the care of someone else, although she could not identify who's care they were in at the time. (Tr. Trans. June 4, 2003, at 75, 76, 86; Tr. Trans. Sept. 25, 2003, at 13, 15.) Indeed, she concedes that leaving her children in the care of others was a bad choice that led to their sexual abuse, but she did not accept responsibility for the abuse because she did not consent to it. (Tr. Trans. Sept. 25, 2003, at 20.) Despite White's argument that her testimony had "no probative value" because the children did not personally tell her what transpired, it is clear from her trial testimony that she believed her children were sexually abused. Id. at 39.
 {¶ 32} In addition to White, the trial court heard testimony given by Spain. Spain testified that she treated S.F., E.C., R.F., and T.F. for various emotional issues, including sexual abuse. Spain began treating S.F. in June 2002, and testified S.F. had an overnight visit with White in July 2002, and when she returned to her foster family, S.F. reported that she had been sexually abused. (Tr. Trans. Sept. 23, 2003, at 113, 117.) According to Spain, S.F. told her that she was fearful of Calvin Smith because he "threatened to shoot her if she told." Id. S.F. also expressed fear that her mother would be "angry with her" for telling because it was "her job to keep it a secret in the family." Id. During S.F.'s therapy, it was also disclosed that her older brother, C.C., had touched her in a sexual way, and that S.F. "had been touching her younger sister [E.C.] sexually as a sort of punishment." Id. at 118. In December 2002, E.C. was referred to Spain for treatment related to the sexual abuse perpetrated by Calvin Smith, as well as her brother, C.C. Id. at 123-131. E.C. expressed fear of her mother for having told about the sexual abuse. Id. at 133. Spain began treating R.F. in January 2003 for past sexual abuse perpetrated by Toby Smith, and in that same month, she began to treat T.F. for several problems, including his past sexual abuse. Id. at 138, 141.
 {¶ 33} There is no dispute that the children were referred to Spain for the purposes of counseling, and, therefore, treatment. Thus, we find Spain's testimony admissible under Evid. R. 803(4), which provides that a hearsay statement is admissible if it is "made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Indeed, many courts have construed this hearsay exception to allow statements made by a child to a psychotherapist or social worker regarding sexual abuse, provided those statements were made in the course of treatment. See, e.g., State v. Durham, Cuyahoga App. No. 84132, 2005-Ohio-202, at ¶ 31 (statements made by child to psychotherapist regarding sexual abuse were deemed made in the course of treatment because psychotherapist was helping to determine an appropriate placement for the child and was also in a position to make a determination whether to remove the child from an abusive situation); State v. Nasser,
Franklin App. No. 02AP-1112, 2003-Ohio-5947; In re Rossantelli, Delaware App. No. 01CAF12072, 2002-Ohio-2525, at ¶ 22 ("`statements made to a social worker are admissible pursuant to Rule 803(4) provided the surrounding circumstances are consistent with medical diagnosis or treatment.'"), quoting State v. Powell (Oct. 3, 2001), Summit App. No. 20067, quoting State v. Grooms (Aug. 19, 1998), Summit App. No. 18558;State v. Geboy (2001), 145 Ohio App.3d 706, 720 (concluding that licensed mental health counselor properly testified as to victim's statements to him under Evid. R. 803(4) exception); State v. White (Aug. 21, 1996), Lorain App. No. 95CA006290, citing State v. Dever (1992),64 Ohio St.3d 401, 409-412; Presley v. Presley (1990), 71 Ohio App.3d 34,39 (admitting testimony of a social worker regarding statements made by the victim child because the social worker was in the best position to help determine proper treatment).
 {¶ 34} The trial court also heard testimony from Chiun Kim ("Kim"), the FCCS caseworker, who stated that she informed White of the children's sexual abuse and had several conversations with her regarding the abuse. (Tr. Trans. Sept. 22, 2003, at 78, 80.) Kim stated that White told her that she was at work when the sexual abuse happened. Id. 83. In a follow up question, to which there was no objection, FCCS asked Kim what was her understanding, based upon conversations that she had with White, of what happened to the children during that visit. Kim stated that while White was at work, White's aunt came to her house and picked S.F. up, and took S.F. back to her home, where Calvin Smith lived and where an incident of abuse took place. Id. 83-84. Kim also testified that when she first told White about the abuse, White initially accused the foster parents of lying so that the children would not be returned to her, and blamed everyone but herself. (Tr. Trans. Sept. 24, 2003, at 74, 123.)
 {¶ 35} We find Kim's testimony is admissible under Evid. R. 801(D)(2)(a) as an admission by party opponent. The rule, by its explicit terms, applies to statements offered against a party where the statements are the party's own. See, e.g., State v. Dunlap, Franklin App. No. 03AP-481, 2003-Ohio-6830, at ¶ 24 ("in order for a statement to be non-hearsay under Evid. R. 801(D)(2), the statement must be offered against the declarant and cannot be in the declarant's favor"); State v.Williams, Franklin App. No. 03AP-287, 2003-Ohio-6663, at ¶ 20-21; Statev. Jackson, Franklin App. 02AP-867, 2003-Ohio-6183, at ¶ 79 ("To be admissible under this rule, a prior out-of-court statement must be: (1) offered against a party; and (2) the statement of the party against whom the statement is being offered") (subsequent history omitted), citingState v. Robb (Apr. 30, 1998), Franklin App. No. 95AP-1003, citingMastran v. Urichich (1988), 37 Ohio St.3d 44, 47. Thus, White's statements to Kim satisfy both requirements of Evid. R. 801(D)(2)(a), and, therefore, are admissible.
 {¶ 36} Given the foregoing, we find that the trial court did not rely upon inadmissible hearsay in making its factual finding that S.F. and E.C. had been sexually abused by Calvin Smith, and R.F. and T.F. had been sexually abused by Toby Smith.
 B. Positive Drug Screens. {¶ 37} White argues that there was no evidence in the record to support Kim's testimony that White returned positive drug screens, therefore, the trial court relied upon inadmissible hearsay in making that factual finding. White has failed to cite to the portion of the transcript evincing Kim's testimony and the trial court's reliance upon same, and admits in her reply brief that she failed to object to Kim's testimony regarding this issue. As such, White has waived all but plain error. Evid. R. 103(A)(1); State v. Murphy, supra.
 {¶ 38} Failure to object to the introduction of hearsay evidence waives any claim of error except for plain error. State v. Gray (Mar. 28, 2000), Franklin App. No. 99AP-666, following State v. Clemons
(1998), 82 Ohio St.3d 438, 444. The doctrine of plain error is limited to exceptionally rare cases in which the error, left unobjected to at the trial court, "rises to the level of challenging the legitimacy of the underlying judicial process itself." See Goldfuss v. Davidson (1997),79 Ohio St.3d 116, 122. In other words, the plain error rule should not be invoked unless, but for the error, the outcome of the trial would clearly have been otherwise. State v. Cooperrider (1983), 4 Ohio St.3d 226,227.
 {¶ 39} Applying the above standard, we do not find plain error. We need not decide whether the trial court erred because White has failed to demonstrate that, but for the error, the outcome of the trial would clearly have been otherwise; an impossible scenario given the overwhelming evidence to support the trial court's decision to terminate parental rights. Cooperrider, supra.
 C. Conclusion. {¶ 40} Based on the foregoing, we find that the record contains ample, credible evidence to support the trial court's factual finding that S.F., E.C., R.F. and T.F. were sexually abused. Further, we find that White has failed to demonstrate plain error involving the trial court's alleged reliance upon inadmissible hearsay concerning White's drug screens. Accordingly, we overrule White's third assignment of error.
IV. FCCS PROVED ITS CASE BY CLEAR AND CONVINCING EVIDENCE
 {¶ 41} White, Fuqua, Currenton, and Wood contend that the trial court erred in awarding permanent custody to FCCS because it failed to prove its case by clear and convincing evidence. Appellants collectively argue that White either completed or substantially completed her case plan, and, therefore, White had remedied the conditions that caused the children's removal. Individually, each appellant advances additional argument.
 {¶ 42} White argues that FCCS was required to prove by clear and convincing evidence that she was an unfit mother, and absent that finding, "the court does not reach consideration of the child's best interests." (Corrected Appellate Brief of White, at 20.) Both she and Fuqua assert that FCCS failed to prove by clear and convincing evidence that the children could not or should not be returned to either of them within a reasonable period of time. To that end, White claims that S.F., R.F., and T.F. "could be reunified with their mother in a reasonable time" because they expressed a desire to "continue to see" her "and be in a permanent living situation." Id. at 19. Fuqua asserts that he was released from prison in early 2004 and "is available to care for his children." (Appellate Brief of Roddell Fuqua, Sr., at 15.)
 {¶ 43} Currenton admits E.C. is not bonded to him and has no desire to live with her mother, and while he concedes he is unlikely to be released from prison any time soon, he "does not desire to lose all parental rights with respect to his children." (Appellate Brief of Currenton, at 2-3.)
 {¶ 44} Wood argues that Spain lacked credibility because she was not a sexual abuse expert, and faults Spain for not concentrating her efforts on family reunification. Wood further asserts "there was no evidence these children made informed decisions about adoption, in light of their desire to remain together." (Appellate Brief of Wood, at 19.)
 {¶ 45} FCCS argues that because the children, with the exception of K.S.,[6] have been in foster care for 12 out of the last 22 months, all that the agency must show is that permanent custody is in the best interest of the child. Therefore, according to FCCS, it did not have to show that the children could have been returned within a reasonable amount of time, and points out that the case relied upon by appellants,In re William S. (1996), 75 Ohio St.3d 95, has to some extent been superseded by statute, and therefore, is not controlling. FCCS also contends that the claims White complied or substantially complied with her case plan are belied by the record.
 {¶ 46} We recognize that parents have a constitutionally protected fundamental interest in the care, custody, and management of their children. Santosky v. Kramer (1982), 455 U.S. 745, 102 S.Ct. 1388,71 L. Ed.2d 599; Troxel v. Granville (2000), 530 U.S. 57, 66,120 S.Ct. 2054, 147 L. Ed.2d 49. The Supreme Court of Ohio has recognized the essential and basic rights of a parent to raise his or her child. Inre Murray (1990), 52 Ohio St.3d 155, 157. These rights, however, are not absolute. In re Awkal (1994), 95 Ohio App.3d 309, 315; In re B.L.,
Franklin App. No. 04AP-1108, 2005-Ohio-1151, at ¶ 7, citing In re Sims,
Jefferson App. No. 02-JE-2, 2002-Ohio-3458, at ¶ 23. A parent's natural rights are always subject to the ultimate welfare of the child. In reCunningham (1979), 59 Ohio St.2d 100, 106. Thus, in certain circumstances, the state may terminate the parental rights of natural parents when necessary for the best interest of the child. In re Wise
(1994), 96 Ohio App.3d 619, 624.
 {¶ 47} A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence. In re Andy-Jones, Franklin App. Nos. 03AP-1167, 03AP-1231,2004-Ohio-3312. "Judgments supported by some competent, credible evidence going to all essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence."Young v. Univ. of Akron, Franklin App. No. 04AP-318, 2004-Ohio-6720, at ¶ 25, citing C.E. Morris Co. v. Foley Constr. Co. (1978),54 Ohio St.2d 279, paragraph one of the syllabus. "Under this standard of review, the appellate court weighs the evidence in order to determine whether the trier of fact `clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" Caldwell v. The Ohio State University, Franklin App. No. 01AP-997, 2002-Ohio-2393, at ¶ 59, quoting State v. Thompkins
(1997), 78 Ohio St.3d 380, 387, quoting State v. Martin (1983),20 Ohio App.3d 172, 175.
 {¶ 48} A judgment is not against the manifest weight of the evidence merely because inconsistent evidence was presented at trial. State v.Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21. "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." Estate of Barbieri v. Evans (1998), 127 Ohio App.3d 207, 211
(citation omitted). Reversing judgment on manifest weight grounds should only be used in exceptional circumstances, when "the evidence weighs heavily against the [judgment]." Thompkins, supra, at 387, quotingMartin, supra.
 {¶ 49} In order to terminate parental rights, the Ohio Revised Code requires that the trial court determine, by clear and convincing evidence, that a grant of permanent custody to the agency that has so moved is in the best interest of the child and that one of four enumerated factors applies. R.C. 2151.414(B)(1). Clear and convincing evidence is that measure of degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the facts to be established. Cross v. Ledford (1954), 161 Ohio St. 469, 120 N.E.2d 118, paragraph three of the syllabus. It is more than a mere preponderance of the evidence, but does not require proof beyond a reasonable doubt. Id. Additionally, the findings of a trial court are presumed correct since, as the trier of fact, it is in the best position to weigh the evidence and evaluate the testimony. In re Brown (1994), 98 Ohio App.3d 337,342; In re Hogle (June 27, 2000), Franklin App. No. 99AP-944.
 {¶ 50} R.C. 2151.414(B)(1) governs the determination of termination of parental rights proceedings, and provides:
Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
(b) The child is abandoned.
(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
 {¶ 51} The record in this case reflects that R.F., S.F., T.F., E.C., and D.S. were placed in the temporary custody of FCCS on July 15, 1999. At the time FCCS filed for permanent custody on October 24, 2000, R.F., S.F., T.F., E.C., and D.S. had continuously been in the custody of FCCS for 15 months. With respect to K.S., the record is clear in that she had been in the temporary custody of FCCS for 12 out of 22 conse-cutive months at the time FCCS re-filed its motion for permanent custody on July 11, 2003, although the record is unclear as to exactly when she was placed in the FCCS' temporary custody. (Complaint filed on July 11, 2003, in case No. 03JU10772; FCCS' Exhibits A-B; Defendant's Exhibits 1-5; Tr. Trans. Sept. 23, 2003, at 145.) As previously stated, however, the record suggests K.S. was removed from White and placed in foster care in October 2000. Our examination of the record reveals that the trial court properly followed this statutory section and found by clear and convincing evidence that the children had been in the temporary custody of FCCS for 12 or more months of a consecutive 22 month period in accordance with R.C. 2151.414(B)(1)(d). See, In re Brooks, Franklin App. Nos. 04AP-164, 04AP-202, 04AP-165, 04AP-201, 2004-Ohio-3887, at ¶ 52-53. Thus, the trial court correctly concluded that the requirement of R.C. 2151.414(B)(1)(d) is satisfied.
 {¶ 52} Given that the trial court properly determined the children had been in the custody of FCCS for 12 or more months of a consecutive 22 month period ending on or after March 18, 1999, it need not find that the children cannot or should not be placed with either parent within a reasonable time. In re G.B., Franklin App. No. 04AP-1024, 2005-Ohio-3141, at ¶ 15; In re Brooks, supra, at ¶ 53, citing In re Williams, Franklin App. No. 02AP-924, 2002-Ohio-7205, at ¶ 46, appeal not accepted for review, 98 Ohio St. 3d 1480; In re Strong, Franklin App. No. 01AP-1418, 2002-Ohio-2247, at ¶ 44; In re Rodgers (2000), 138 Ohio App.3d 510; Inre Dyal (Aug. 9, 2001), Hocking App. No. 01CA12. See, also, In reThompson, Franklin App. No. 02AP-557, 2003-Ohio-580, at ¶ 49. Consequently, even though the trial court tacitly acknowledged the fact the children could not or should not be returned within a reasonable amount of time, this finding was unnecessary to the resolution of this case. In the Matter of Bray, Franklin App. No. 04AP-842, 2005-Ohio-1540, at ¶ 10; Williams, supra, at ¶ 68; In re K. K.H., Cuyahoga App. No. 83410, 2004-Ohio-4629, at ¶ 31; In re Decker, Athens App. No. 00CA042. Similarly, the trial court was not required to expressly declare that White was an unfit parent. In re Stillman (2003), 155 Ohio App.3d 333,341.
 {¶ 53} Turning our attention to the second part of the analysis, once having determined that the children had been in the custody of FCCS for 12 months of a consecutive 22 month period, the trial court must also make the determination as to whether permanent custody is in the best interest of the children by considering all relevant factors, including, but not limited to the five factors listed in R.C. 2151.414(D):
(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.
A trial court is not required to specifically enumerate each factor under R.C. 2151.414(D) in its decision. In re Heyman (Aug. 13, 1996), Franklin App. No. 96AP-194. However, there must be some indication on the record that all of the necessary factors were considered. Id.; In reHershberger, Allen App. No. 1-04-55, 2005-Ohio-429, at ¶ 28.
 {¶ 54} The trial court noted in its decision that its determination of the children's best interests was made pursuant to these factors. Such a determination must be shown by clear and convincing evidence. R.C. 2151.414(B)(1). At the outset, we note that with the exception of White, who argues that a bond exists between her and the children, appellants do not specifically challenge the trial court's findings regarding the best interests of the children. Nonetheless, we will review the record to determine whether sufficient evidence supports these findings.
 {¶ 55} Several witnesses presented testimony relevant to the interaction and interrelationship of the children with their mother, siblings, relatives, foster parents and out-of-home providers, pursuant to subsection (D)(1) above. Kim testified that on visits with his mother, R.F. would spend more time with her than with White. (Tr. Trans. Sept. 22, 2003, at 123.) She stated that S.F. did not interact much with White during visits, but rather, played with E.C. Id. at 127. Kim also testified that S.F. did not ask about her father. Id. at 128. As for T.F., Kim testified that he was not bonded to his mother, and never mentioned his father. Id. During visitations, he would usually crawl under the table and hide out, or interact with R.F. Id. at 129. Conversations with his mother would entail what gifts he wanted. Id. at 128. Kim testified that E.C. was bonded to her foster parents and not her birth parents. Id. at 129, 130. She would tell Kim that she wanted to see her mother "because mom's got a gift for me" and not because she missed her. Id. at 129. Regarding D.S. and K.S., Kim testified that they are bonded to their foster parents and not their birth parents. Id. at 131-134. On visits with their mother, D.S. and K.S. would usually interact with each other. Id. at 132.
 {¶ 56} Spain testified that after S.F.'s sexual abuse, S.F. was "frightened of her mother" and did not want to visit with her. Id. at 117, 120, 173, 217. Spain recommended that visitation be suspended between S.F. and White because, immediately before and after visitation, S.F.'s grades would slip, she would be angry, lash out at her siblings, and would stop taking pride in her appearance. Id. at 121-123. S.F. told Spain that she did not have much to talk about with White, and stayed on her own side of the room. Id. at 123, 172, 213.
 {¶ 57} In her first session with Spain, E.C. asked Spain to "fix it so I don't have to go see my mom. I've had enough." Id. Spain explained that when she discussed White with E.C., her "strongest emotion [was] fear," and she never asked to go on a visit. Id. at 133, 184. Spain related how S.F. once came back from a visit with White and told E.C. that White was getting married, but because E.C. did not go on visits, she would not get to be a flower girl. S.F. had once been a flower girl, and after E.C. saw the pictures, "it was her dearest desire in the world to be a flower girl * * *." Id. at 133, 134. Despite her desire, E.C. told Spain that she still did not want to go on a visit. Id. When she would visit with her mother, E.C. would have severe headaches, often wet her bed, and would not eat. Id. 137. When visitation ended between E.C. and White, those behaviors ceased. Id.
 {¶ 58} Spain testified that R.F. told Spain that he wanted to end visitations with his mother, but did want to see her one last time to say good-bye. Id. 139. On one occasion, his brother came back from a visit with his mother with a Gameboy and told R.F. that he could get one if he went on a visit. Despite R.F.'s desire for his own Gameboy, he chose not to visit with White. Id. at 140.
 {¶ 59} With respect to T.F., Spain testified that T.F. "knows what he wants" and he "wants to have a permanent home." Id. She stated that he "would love to have his mother be able to take him back and bring him up, but intellectually he doesn't believe that's going to happen. He has some real trust issues as he puts it." Id. at 142. T.F. is academically gifted and a year ahead of his classmates in school, but according to Spain, he lacks academic motivation because of the uncertainty of his future, which stemmed from the impermanency of his past. Id. at 141-143.
 {¶ 60} Spain testified that D.S. and K.S. are both attached to their foster family. Id. at 145. D.S. told Spain that he has three mommies, "I have a mommy who died [his previous foster mother] and I have a black mommy and I have Dianne." Id. at 145. As of September 2003, D.S. had not been visiting with White, nor did he ask to visit with her.
 {¶ 61} Regarding the children's fathers, Spain stated that none of them played an important role in their children's lives, nor were the children bonded with them. Id. In fact, Spain testified that on one occasion when their fathers were mentioned, E.C. and S.F. began to fight because one of their fathers shot the other one's father or uncle. Id. 146.
 {¶ 62} Givens also provided testimony. In her visitation report dated October 27, 2003, Givens recommended that none of the children have visitation with White, although S.F. and T.F. requested limited supervised visits. Givens expressed her concern that competitive and negative behavior would increase if some of the children visited with White and some did not. At trial, Givens testified that some of the children expressed a desire to visit with White because she brought them "toys or candy or food." (Tr. Trans. Nov. 4, 2003, at 51.) Givens also stated that S.F. has a bond with her mother, but would not feel safe living with her and wanted to move on with her life. (Tr. Trans. Sept. 25, 2003, at 105; Tr. Trans. Nov. 4, 2003, at 36.) Regarding the children's fathers, Givens testified that none of the children felt that reunification with their fathers were viable options. (Tr. Trans. Nov. 4, 2003, at 33, 38.)
 {¶ 63} Next, regarding the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, pursuant to subsection (D)(2), Givens testified it was in the best interest of each child to be placed in the permanent custody of FCCS. (Tr. Trans. Sept. 25, 2003, at 104-107.) In her final report to the trial court, filed on November 10, 2003, Givens' recommendation was the same as her oral recom-mendations expressed at trial, and was in accord with the wishes of each child, each of whom she found competent. In her report dated October 29, 2003, Givens wrote that "[a]ll children have expressed a very strong desire to `get on with life' and live in a stable, safe environment." Id.
 {¶ 64} As stated earlier, the children had been in the custody of FCCS for 12 or more months of a consecutive 22 month period. Thus, the custodial history of the children, which we must consider pursuant to R.C. 2151.414(D)(3), weighs against White, Fuqua, and Currenton.
 {¶ 65} Finally, we consider evidence relevant to R.C. 2151.414(D)(4), the chil-dren's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to FCCS. In the present case, there was clear and convincing evidence that the children were in need of a permanent placement and such could not be achieved without a grant of permanent custody to FCCS.
 {¶ 66} It is of importance to note that not one of the professionals involved with this family opined that custody of the children should be returned to White, or legal custody given to Wood, at any time during the hearings on FCCS' motion for permanent custody. Kim testified that the children expressed fear about returning to their mother; fear that they would be unsafe and unprotected. (Tr. Trans. Sept. 22, 2003, at 124; Tr. Trans. Sept. 24, 2003, at 77; Tr. Trans. July 14, 2004, at 56.) She did not believe the children should be returned to White because she "can't protect her children." (Tr. Trans. Sept. 22, 2003, at 61.) Givens testified that she would not recommend the children be returned to White because "she would be unable to parent eight or seven children as they need it." (Tr. Trans. Sept. 25, 2003, at 119.) Nor did she believe that placement of the children with Woods, discussed infra, would be in their best interest. (Report of Guardian Ad Litem, Oct. 29, 2003; Tr. Trans. Sept. 25, 2003, at 118.) She further explained that all the children have a fear of rejection and inconsistency, and need permanency in their lives. (Tr. Trans. Sept. 22, 2003, at 124.) Spain testified that she would be concerned if any of the children were returned to White. (Tr. Trans. Sept. 23, 2003, at 148.) She stated that despite the traumatic events in their lives, they "have a real good shot of growing up and having a healthy, happy life." Id. But in order to achieve that goal, Spain believed that the children needed permanency and stability in their lives, which White could not offer.
 {¶ 67} Further, the trial court found that neither Currenton nor Fuqua could provide legally secure placement because they were both incarcerated, and at the time of trial, "unlikely to be released for a significant period." (Decision and entry, Oct. 20, 2004, at 13.) Indeed, Currenton is still incarcerated, and though Fuqua has since been released, he testified at trial he would not be released until September 2006, on furlough.
 {¶ 68} Lastly, R.C. 2151.414(D)(5), which requires the trial court to consider the factors set forth in R.C. 2151.414(E)(7)-(11), is not applicable based on the facts of this case.
 {¶ 69} Upon our review of all the evidence in this case, we find there was sufficient evidence for the trial court to determine that FCCS had established, by clear and convincing evidence, that the children were in foster care for 12 out of 22 consecutive months. We further conclude there was sufficient evidence for the trial court to find by clear and convincing evidence that the best interests of the children are served by placing them in the permanent custody of FCCS to facilitate their adoption into permanent homes. Considering the foregoing, we conclude that the judgment of the trial court in granting permanent custody of the children to FCCS was not against the manifest weight of the evidence.
 {¶ 70} Based on the foregoing, we overrule White's fourth assignment of error, Fuqua's third assignment of error, Currenton's assignment of error, and Wood's second assignment of error.
V. THE TRIAL COURT DID NOT ERR IN DENYING APPELLANTS' MOTION FOR NEWTRIAL.
 {¶ 71} On December 19, 2003, White, joined by Fuqua as it related to his three children, filed a motion for new trial pursuant to Civ. R. 59(B), alleging newly discovered evidence. Specifically, White claims that during her final visit with her children, they told her they wanted to live with her and did not want to be adopted. (Affidavit of Tiffany White, at ¶ 4.) White avers that the children were too afraid to tell their true wishes to the judge, who interviewed C.C. and T.F., in camera, Spain, Kim, and Givens. White claims that the children told her they were in constant fear "because there are video cameras all around the house," and being under surveillance inhibited their honesty. Id. In addition, White states that S.F. told her that E.C. was not sexually abused by Calvin, and "E.C. cries constantly because she is in fear she will go to jail for perjury if she now tells the truth." Id., at ¶ 3. According to White, the trial court should have granted her motion for new trial and ordered Givens to observe her with her children and render an additional report.
 {¶ 72} The trial court held a hearing on White's motion on July 14, 2004. Givens and Latasha Longshore, the FCCS caseworker who replaced Kim, testified. White did not attend the hearing, and Fuqua, who was present, did not testify. According to Givens, she spoke with the children after the motion for new trial was filed, and found that the children's wishes were the same as during trial on the permanency motion in that no child wished to live with White. (Tr. Trans. July 14, 2004, at 46, 47.) Givens also stated she believed the children were being truthful in their answers. Id. at 46. In addition, Givens spoke to Spain, the children's therapist, since the December 2003 visit with White, and testified that the children were "therapeutically" in the same position as at the end of the permanent custody trial. Id. at 51.
 {¶ 73} On August 1, 2004, the trial court denied the motion for new trial. It found:
The evidence is still clear and convincing, that after interviewing each of the children several times after these motions for a new trial, stay and visitation were filed, the guardian ad litem found that none of the children has changed his or her respective positions on those motions or the complaint for permanent custody or their individual statements made before the trial to the guardian ad litem. Erin [Givens] interviewed K.S., D.S., E.C., T.F., S.F., and R.F. two or more times since the filing of the post-trial motions. Their statements, individually, were identical to their original statements. T.F. and E.F. wanted to be in a different foster home because they dislike some decisions made by their foster family that curtail events that they want to attend. R.F. and E.C. both want to be adopted. D.S. and K.S. want to live with their foster family. The guardian, subsequent to the post-trial motions filed, communicated with the children's therapists concerning the children's allegations. Neither the guardian ad litem nor the therapists changed their recommendation since trial.
 * * * *
The guardian admitted that T.F. and E.C. want to see their mother and their grandparents in the future, but have no desire to live with their mother.
The guardian also admitted that R.F., S.F. and T.F. want visits in the future with their father, Roddell, on a regular basis.
 * * * *
The evidence does not support any of the allegations of Tiffany White or Roddell Fuqua. Indeed, neither testified, so there is no evidence in support of the motion for new trial on newly discovered evidence. To the contrary, the only evidence presented was that the children's guardian ad litem that the children do not wish to live with their mother, that some opt for adoption, and some to live with their foster families. The fact that some want a continuing relationship with family members is not new evidence.
The evidence not sustaining the movants' burden of proof, the motions for new trials are denied for good cause shown.
(Decision and journal entry dated August 10, 2004, at 3-4.)
 {¶ 74} Civ. R. 59(A)(8) permits a new trial on the ground of newly discovered evidence where such evidence is material for the party applying, and where it could not with reasonable diligence have been discovered and produced at trial. Id. The standard to be applied in determining whether to grant a new trial based on newly discovered evidence is set forth in the third paragraph of the syllabus in Sheen v.Kubiac (1936), 131 Ohio St. 52, 1 N.E.2d 943, which provides:
To warrant the granting of a motion for a new trial based on the ground of newly discovered evidence, it must be shown that (1) the new evidence must be such as will probably change the result if a new trial is granted, (2) it must have been discovered since the trial, (3) it must be such as could not in the exercise of due diligence have been discovered before the trial, (4) it must be material to the issues, (5) it must not be merely cumulative to former evidence, and (6) it must not merely impeach or contradict the former evidence.
Additionally, the decision of whether to grant or deny a motion for new trial is committed to the sound discretion of the trial court. State v.Matthews (1998), 81 Ohio St.3d 375, citing State v. Schiebel (1990),55 Ohio St.3d 71, paragraph one of the syllabus; Taylor v. Ross (1948),150 Ohio St. 448. We will not reverse a trial court's denial of a motion for new trial absent an abuse of that discretion. Sharp v. Norfolk W.Ry. Co. (1995), 72 Ohio St.3d 307. An abuse of discretion implies that a court's ruling is unreasonable, arbitrary, or unconscionable; it is more than a mere error of law or judgment. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219.
 {¶ 75} "In general, newly discovered evidence has been interpreted to mean facts in existence at the time of trial of which the aggrieved party was excusably ignorant." In Re S.S., Wayne App. No. 04CA0032,2004-Ohio-5371, at ¶ 13, citing Schwenk v. Schwenk (1982),2 Ohio App. 3d 250, 253. See, also, Bachtel v. Bachtel, Mahoning App. No. 03 MA 75, 2004-Ohio-2807, at ¶ 46 (newly discovered evidence cannot be evidence that did not exist prior to trial). Further, "newly discovered evidence which purportedly recants testimony given at trial is `looked upon with the utmost suspicion.'" State v. Wilburn (Dec. 22, 1999), Lawrence App. No. 98CA47, quoting State v. Isham (Jan. 24, 1997), Montgomery App. No. 15976.
 {¶ 76} The newly discovered evidence White produced in this case consists of statements allegedly made by the children to her during their final visit as attested to by White in her affidavit. These alleged statements, however, are not admissible because they are hearsay, and no exception to the hearsay rule applies. Thus, there is no competent, credible evidence in support of the motion for new trial. Even if admissible, the alleged statements would not likely change the result of the custody determination. While the wishes of the children are a necessary consideration, they are not dispositive. In re Hill, Geauga App. No. 2002-G-2486, 2003-Ohio-1748, at ¶ 65 (while the court must consider all four factors found in 2151.414(D), "no factor is solely dispositive of the issue, and each needs to be given proper consideration."), citing In re Jacobs (Aug. 25, 2000), Geauga App. No. 1999-G-2231. The alleged statements do not impact the trial court's determination that White demonstrated an inability or unwillingness to protect her children, failed to complete her case plan, and, thus, failed to remedy the conditions that caused their removal.
 {¶ 77} Because the newly discovered evidence submitted by White and Fuqua is inadmissible hearsay, and would not have changed the result of the custody hearing, we find that the trial court did not abuse its discretion in denying appellants' motion for a new trial. Accordingly, we overrule White's fifth assignment of error, which renders moot Wood's sixth assignment of error.
VI. THE GUARDIAN AD LITEM ADEQUATELY DISCHARGED HER DUTIES.
 {¶ 78} White did not have visitation with the children immediately prior to the trial court terminating her parental rights and awarding custody to FCCS. After the trial court's custody determination, the trial court allowed for a final visit between White and the children. The trial court instructed that Givens should be present for the final visit. An FCCS caseworker, having construed the court's order as a mere "recommendation," did not allow Givens to be present.
 {¶ 79} White and Fuqua contend that the trial court erred by not requiring Givens to observe the children's interaction with White prior to severing parental rights. He also argues that based on FCCS' failure to follow the trial court's order requiring Givens present at the final visit, the trial court erred in not ordering another visit. Additionally, appellants take issue with the fact Givens was appointed during the adjudication process, having replaced a guardian ad litem whom the trial court permitted to withdraw.
 {¶ 80} Appellants fail to cite to any Ohio authority in support of their position. According to App. R. 12(A)(2), we may disregard an assignment of error if an appellant fails to cite to any legal authority in support of an argument as required by App. R. 16(A)(7). See, e.g., Hallv. Tucker (2005), 161 Ohio App.3d 245, 263; State v. Martin (July 12, 1999), Warren App. No. CA99-01-003; Meerhoff v. Huntington Mtg. Co.
(1995), 103 Ohio App.3d 164, 169. Moreover, the trial court had already awarded permanent custody to FCCS, therefore, whatever transpired during White's final visit with the children was wholly irrelevant to the trial court's custody determination. Notwithstanding, in the interests of justice, we will address the merits of appellants' argument.
 {¶ 81} Loc. R. 15 of the Franklin County Common Pleas Court, Domestic Relations Division, provides that "upon appointment, the Attorney/Guardian Ad Litem in every case shall perform certain basic duties, identified below. The feasibility of some of the duties will depend upon the age(s) of the children and the specific circumstances of each case. Therefore, it is within the discretion of the guardian ad litem to tailor each to the facts of the individual case." The enumerated duties include interviewing the children and observing each parent with the children, reviewing pleadings and consulting with attorneys, investigating and interviewing all significant persons, obtaining relevant records, performing home visits, evaluating the need for psychological evaluations or counseling, communicating with protective services worker, and attending all depositions concerning the best interest of the children. It is axiomatic that by conferring discretion upon the guardian ad litem, the failure to perform one of the above-enumerated duties cannot be construed to mean that the guardian ad litem did not properly discharge her duties. Instead, "the facts of the individual case" must be considered.
 {¶ 82} In addition to Loc. R. 15, R.C. 2151.281(I) provides that "[t]he guardian ad litem for an alleged or adjudicated abused, neglected, or dependent child shall perform whatever functions are necessary to protect the best interest of the child, including, but not limited to, investigation, mediation, monitoring court proceedings, and monitoring the services provided the child by the public children services agency or private child placing agency that has temporary or permanent custody of the child, and shall file any motions and other court papers that are in the best interest of the child." Further, R.C. 2151.281(J) mandates the juvenile court to reappoint a guardian ad litem in the event one withdraws, which was precisely the case here.
 {¶ 83} Ohio courts have held that a guardian ad litem's report can be admitted, and her testimony found credible, even though the guardian ad litem did not personally observe interaction between parent and child. See, e.g., In re Heldt/Woodson, Stark App. No. 2004CA00191, 2004-Ohio-5188;In re Gaugler, Stark App. No. 2004-CA-00114, 2004-Ohio-4114 (trial court did not err in admitting final report of guardian ad litem despite local rule requiring a guardian ad litem to personally observe interaction of parent and child because she was familiar with the circumstances surrounding the child's removal and family history); In re J.G. D.G., Summit App. No. 21944, 2004-Ohio-2513.
 {¶ 84} In this case, the record discloses that Givens spoke with the prior guardian ad litem, reviewed the hearing transcripts and the children's in-camera interviews, con-sidered the annual and semi-annual administrative reviews and case plan goals, examined treatment team status reports and records of client activities, spent time with the children and interviewed them, and communicated with Kim and Spain, as well as Woods and Sybil Bell, both of whom were potential placements for the children. It is clear from Givens' reports and testimony that she was fully informed as to the circumstances of this case.
 {¶ 85} Based on the foregoing, we find Givens properly discharged her duties, and as such, the trial court did not err in not requiring her to personally observe White's interaction with the children after permanent custody was granted to FCCS. Accordingly, Fuqua's fourth and White's sixth assignments of error are overruled.
VII. REAPPOINTMENT OF COUNSEL FOR THE CHILDREN WAS NOT NECESSARYBECAUSE THE WISHES OF THE CHILDREN DID NOT CONFLICT WITH THE GUARDIAN ADLITEM'S RECOMMENDATION.
 {¶ 86} On the first day of trial, independent counsel for R.F., S.F., and T.F. moved to withdraw as the children were "no longer holding a position [that was] inconsistent with that of the guardian's." (Tr. Trans. June 2, 2003, at 39.) She indicated that she would still, however, remain as counsel for C.C. Id. Jill Couch, Esq., the children's guardian ad litem at that time, agreed that R.F., S.F., and T.F. no longer needed legal counsel. Id. Based upon the fact no party objected to counsel's withdrawal, the trial court granted her motion. Id. at 40.
 {¶ 87} Fuqua and Wood argue that a conflict arose during trial between Givens, who recommended permanent commitment, and the wishes of R.F., S.F., and T.F., who expressed the desire to be able to visit with their parents. As such, appellants contend that the trial court erred when it failed to reappoint independent counsel, and direct our attention to Inre Williams (2004), 101 Ohio St.3d 398, syllabus ("pursuant to R.C. 2151.352, as clarified by Juv. R. 4(A) and 2(Y), a child who is the subject of a juvenile court proceeding to terminate parental rights is a party to that proceeding and, therefore, is entitled to independent counsel in certain circumstances."), and In re Swisher, Franklin App. Nos. 02AP-1408, 02AP-1409, 2003-Ohio-5446 (when the guardian ad litem's position regarding the best interest of the children conflicts with the wishes of the children, the trial court should give due regard to the child's maturity and understanding of the proceedings, and if an actual conflict is found, independent counsel should be appointed to represent the child's interests and expressed wishes).
 {¶ 88} In In re Williams, one of the children in the permanent custody motion had repeatedly expressed his desire to remain with his mother. The guardian ad litem recommended that the motion for permanent custody be granted with respect to this child. The trial court appointed a separate attorney to represent the child, but only for the limited purpose of filing a response to the motion for permanent custody stating the child's position. The court ruled that there was no need to appoint an attorney to fully represent the child's interests after the limited-appointment attorney filed a brief statement indicating the child's wish to return to his mother.
 {¶ 89} The Supreme Court of Ohio affirmed the court of appeals' decision to reverse and remand for an unlimited appointment of an attorney to represent the child, along with a new trial. The court began by noting that the plain language of R.C. 2151.352 provides for the right to appointed counsel for every child "not represented by the child's parent, guardian, or custodian" in a permanent custody proceeding. See, also, State ex rel. Asberry v. Payne (1998), 82 Ohio St.3d 44. The In reWilliams court approved of the court of appeals' recognition that, "courts should make a determination, on a case-by-case basis, whether the child actually needs independent counsel, taking into account the maturity of the child and the possibility of the child's guardian ad litem being appointed to represent the child." Id. at 403.
 {¶ 90} The court also approved of the court of appeals' holding that, pursuant to Juv. R. 4(C) and R.C. 2151.281(H), a guardian ad litem can serve a dual role as both the guardian ad litem and the juvenile's attorney, and thereby fulfill the juvenile's right to counsel, so long as there has been an express dual appointment. Id. at 403. However, this is so only when the attorney who has been appointed to serve in both capacities recommends a disposition not in conflict with the juvenile's wishes. If such a conflict arises, the juvenile court must appoint independent counsel to represent the child. Id.
 {¶ 91} In In re Swisher, supra, at ¶ 40-41, we reversed and remanded the trial court's custody determination because the record did not contain reliable evidence concerning the children's wishes as none of them testified at the hearing, none were interviewed in chambers, the guardian ad litem did not testify, and the guardian ad litem's report was filed after the hearing and failed to include a statement regarding the children's wishes. In providing guidance on remand, we explained that the trial court should utilize the procedure set forth in In re Williams,
Geauga App. No. 2002-G-2454, 2002-Ohio-6588, at ¶ 26, affirmed,101 Ohio St.3d 398, in determining whether the children should be appointed independent counsel should they express a "strong desire to be reunified with their [parents]." Swisher, supra, at ¶ 46-47. We explained:
If the children express such a desire and this desire is contrary to the guardian ad litem's position, the court should inquire further to determine whether an actual conflict exists between the children's desire and the guardian ad litem's position. In determining whether an actual conflict exists, the court should give due regard to the children's maturity and ability to understand the proceedings. If, after considering those factors, the court determines that an actual conflict exists, the court should appoint counsel to represent the children.
Id. at ¶ 48.
 {¶ 92} Upon a thorough review of the entire record, and based upon the uncontroverted testimony of Spain and Givens, both of whom testified that no child expressed a desire for reunification, we find there was no conflict between the wishes of the children and the recommendation of the guardian ad litem. That finding, along with the abundant evidence supporting the trial court's findings that the children's best interests are served by awarding permanent custody to FCCS, we conclude that the trial court did not err in failing to reappoint counsel for the children.
 {¶ 93} Based on the foregoing, we overrule Fuqua's fifth and Wood's fourth assignments of error.
VIII. THE TRIAL COURT DID NOT ERR IN DENYING WOOD'S MOTION FORLEGAL CUSTODY.
 {¶ 94} Givens and Kim both recommended against placement of the children with Wood. In Givens' report dated October 29, 2003, she wrote that placement with Wood would not be in the best interest of the children because Wood had no stable employment, problematic transportation, which resulted in her absence from trial and inability to personally meet with Givens, and it was unclear as to what extent Wood had interacted with the children. At trial, Givens explained that reliable transportation was necessary because of the children's continued need to attend counseling. (Tr. Trans. Sept. 25, 2003, at 118.) Givens also testified that she informed R.F., S.F., and T.F. that she would be meeting with Wood regarding their possible placement, and when asked if they had any feelings about living with Wood, they did not respond to her question. Tr. Trans. Nov. 4, 2003, at 46.
 {¶ 95} Kim testified that she conducted a home study of Wood on her own accord. Tr. Trans. Sept. 22, 2003, at 119. After doing so, she concluded that placement with Wood would not be in the best interests of the children because Wood had no income, inadequate housing, and since age 16, had been involved with a man who had been imprisoned on a felonious drug charge and did not have custody of his own children. Id.; Tr. Trans. Sept. 24, 2003, at 120.
 {¶ 96} In its decision dated December 10, 2003, at 4, 7, the trial court denied Wood's request for legal custody, relying upon Givens' recommendation and position that placement with Wood would not be in the best interest of any child.
 {¶ 97} Wood argues that she is entitled to legal custody of the children. She contends that the guardian ad litem did not "properly investigate" whether she was a suitable placement. Specifically, she asserts that the guardian ad litem failed to visit Wood's home in Steubenville, and failed to comply with Swisher, supra, which Wood contends required Givens to specifically ask each child whether they wanted to live with her. Wood also takes issue with Kim's testimony, and questions her credibility.
 {¶ 98} In the case sub judice, the trial court examined all of the evidence and determined that placing the children with Wood was not in the best interests of the children. Based upon Givens' recommendation, we find that the trial court had before it sufficient, competent, and credible evidence to support its judgment, which we cannot characterize as arbitrary, unreasonable, or capricious. In addition, Wood, as a relative, was not entitled to the same presumptive rights that a parent receives, and therefore, Givens was not required to follow the dictates set forth in Swisher, supra, as it relates to Wood. See, e.g., In reZorns, Franklin App. Nos. 02AP-1297, 02AP-1298, 2003-Ohio-5664, at ¶ 28 ("Indeed, relatives seeking legal custody of a child are not afforded the same presumptive rights that a parent receives as a matter of law."), citing In the Matter of Dyal (Aug. 9, 2001), Hocking App. No. 01CA11. Thus, we find ample evidence in the record to support the trial court's determination.
 {¶ 99} Based on the foregoing, we overrule Wood's first and fifth assignments of error.
IX. WOOD WAS NOT DENIED EFFECTIVE ASSISTANCE OF COUNSEL.
 {¶ 100} Wood contends that she was denied effective assistance of counsel because her trial counsel failed to file a motion for a new trial, and argue that R.C. 2151.414(B)(1)(d) was unconstitutional.
 {¶ 101} In order to prevail on a claim of ineffective assistance of counsel under Strickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052,80 L. Ed.2d 674, appellants must show that "counsel's performance fell below an objective standard of reasonableness and that prejudice arose from counsel's performance." State v. Reynolds (1998), 80 Ohio St.3d 670,674. The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. Strickland, supra, at 686. Thus, a two-part test is necessary to examine such claims. First, Wood must show that her counsel's performance was objectively deficient by producing evidence that counsel acted unreasonably. State v. Keith (1997), 79 Ohio St.3d 514,534. Second, Wood must show that, but for her counsel's errors, there is a reasonable probability that the results of the trial would be different. Id. "A reasonable probability is a probability sufficient to undermine the confidence in the outcome." State v. Carpenter (1996),116 Ohio App.3d 615, 622.
 {¶ 102} The burden of showing ineffective assistance of counsel is on the party asserting it. State v. Smith (1985), 17 Ohio St.3d 98. Trial counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. State v.Sallie (1998), 81 Ohio St.3d 673, 675. Tactical or strategic trial decisions, even if ultimately unsuccessful, do not generally constitute ineffective assistance of counsel. State v. Carter (1995),72 Ohio St.3d 545, 558 ("judicial scrutiny of counsel's performance is to be highly deferential, and reviewing courts must refrain from second-guessing the strategic decisions of trial counsel"); State v.Carpenter (1996), 116 Ohio App.3d 615, 626 (court of appeals is to "presume that a broad range of choices, perhaps even disastrous ones, are made on the basis of tactical decisions and do not constitute ineffective assistance").
 {¶ 103} In this case, however, we need not address the two prongs of an ineffective assistance claim in the order set forth in Strickland.
"[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."Strickland, supra, at 697.
 {¶ 104} Because we have already determined that R.C. 2151.414(B)(1)(d) is constitutional, and concluded the trial court properly denied the motion for new trial, Wood is unable to demonstrate she suffered prejudice because of her trial counsel's failure to raise these issues. Based on the foregoing, Wood's seventh assignment of error is overruled.
X. RECAPITULATION.
 {¶ 105} For the foregoing reasons, appellants assignments of error, in toto, are overruled: Part I. Overrules White's and Fuqua's first assignments of error and Wood's third assignment of error; Part II. Overrules White's and Fuqua's second assignment of error; Part III. Overrules White's third assignment of error; Part IV. Overrules White fourth assignment of error, Fuqua's third assignment of error, Currenton's assignment of error, and Wood's second assignment of error; Part V. overrules White's fifth assignment of error and renders Wood's sixth assignment of error moot; Part VI. Overrules Fuqua's fourth and White's sixth assignments of error; Part VII. Overrules Fuqua's fifth and Wood's fourth assignments of error; Part VIII. Overrules Wood's first and fifth assignments of error; and Part IX. Overrules Wood's seventh assignment of error. The judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, is affirmed.
Judgment affirmed.
Brown, P.J., and French, J., concur.
[1] The record does not disclose an appeal of the award of S.F. and E.C. to the permanent custody of FCCS.
[2] Quayla is now deceased.
[3] There are six assignments of error included in the section of White's brief that contains the statement of the assignments of error presented for review (page 1). Her brief, however, does not contain argument concerning her sixth assignment of error. It also appears that argument may be missing from White's brief, as text ending on the bottom of one page does not correlate to the text starting the next page. The foregoing is relevant as to explain why this court was unable to review and properly consider White's sixth assignment of error, as well as any argument that may have been intended but was omitted.
[4] We note that in her brief, White states that R.C. 2151.414(E) is unconstitutional. (Corrected Appellate Brief of White, at 8.) Absent from her brief, however, is any discussion pertaining to this statute. Indeed, her argument under this assignment of error exclusively concerns the "12 out of 22" consecutive months requirement found in R.C. 2151.414(B)(1)(d). In the event White's lone reference to R.C. 2151.414(E) is anything other than a typographical error, we decline to address the constitutionality of R.C. 2151.414(E) as it was not raised at the trial court level. In re Dailey, Franklin App. No. 04AP-1346, 2005-Ohio-2196, at ¶ 25.
[5] The record discloses that appellants herein did not file objections to the magistrate's decision, nor did they file a response to FCCS' motion.
[6] This assertion by FCCS is juxtaposed its position at trial, wherein it asserted that all seven children had been in foster care 12 out of 22 consecutive months. (Tr. Trans. Nov. 4, 2003, at 77, 79, 83.) No party disputed that fact during the permanent custody hearing, nor does any appellant on appeal. Contrary to FCCS' assertion in its brief, the record supports the trial court's determination that K.S. was in foster care for 12 out of a consecutive 22 months. (See, e.g., FCCS' Exhibits A-B; Defendant's Exhibits 1-5; Tr. Trans. Sept. 22, 2003, at 134; Tr. Trans. Sept. 23, 2003, at 145.)