DECISION
{¶ 1} Appellant, Mary Larkett ("Larkett"), appeals from the July 6, 2005, judgment entry of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, that awarded legal custody of A.V. to her foster mother, Doris Siby ("Siby"). Finding no error in the proceedings below, we affirm.
 {¶ 2} The factual underpinnings of this case are as follows. A.V. was born on September 3, 2002, to Davonna Johnson ("Davonna") while she was incarcerated. Three days after her birth, Franklin County Children's Services ("FCCS") was awarded temporary custody of A.V., and placed her into foster care placement with Doris and Babacar Siby ("the Sibys"). Davonna identified Anthony Vanler ("Vanler") as A.V.'s father, and on December 16, 2002, the trial court ordered genetic testing to determine paternity. The result of that test released in June 2003, confirmed that Vanler was A.V.'s father. Confirmation of paternity was a formality, however, as both FCCS and Vanler believed he was A.V.'s father and had acted in accordance with that belief since A.V.'s birth.
 {¶ 3} Davonna was released from prison in April 2003. After her release, she filed a motion requesting visitation with A.V. The matter was dismissed on July 11, 2003, when Davonna failed to appear at the hearing on that motion. Thereafter, on August 7, 2003, FCCS moved for permanent custody.
 {¶ 4} Sometime during the summer of 2003, while Vanler was still incarcerated, his attorney contacted Larkett and informed her of A.V.'s existence. On August 22, 2003, Larkett filed a motion to be joined as a party and for legal custody. In an entry dated October 14, 2003, the magistrate ordered Larkett be allowed visitation with A.V.
 {¶ 5} While in prison, Vanler participated in parenting classes and attempted to make progress on the case plan. Subsequent to his release in November 2003, he began visiting A.V. on a regular basis and continued to put forth effort towards completing the case plan. Vanler's diligence prompted FCCS to withdraw the PCC motion filed on August 7, 2003, and instead, adopt a "wait and see approach" by requesting the court to extend the temporary custody order, thus, giving Vanler time to complete the case plan. In an entry dated February 13, 2004, the court extended the temporary custody of A.V. to FCCS for six months, finding "there has been significant progress on the case plan and there is reasonable cause to believe the child will be reunified with a parent [Vanler] or otherwise permanently placed within the period of extension." (Entry dated February 13, 2004, at 2.) Tragically, however, Vanler was murdered on February 15, 2004. Three days after his death, Larkett filed a second motion for legal custody. On May 25, 2004, Siby filed a motion to be joined as a party, and on June 24, 2004, moved for legal custody of A.V.[1]
 {¶ 6} A hearing on the competing motions was held before a magistrate on several dates spanning from July 13, 2004, to September 27, 2004. The magistrate issued his decision on December 7, 2004, which adopted the findings of fact and conclusions of law submitted by Siby, and recommended that it would be in A.V.'s best interest to be committed to the legal custody of Siby, with visitation privileges to Larkett.
{¶ 7} On December 15, 2004, Larkett filed cursory objections to the magistrate's report, indicating she would supplement her objections when a transcript of the hearing before the magistrate was obtained. Subsequently, on December 28, 2004, Larkett filed a motion requesting the trial court order the transcript from the court reporter at public expense. On February 9, 2005 the trial court denied that motion. Although the record is unclear as to when the transcript was ordered, Larkett filed supplemental objections to the magistrate's report on May 4, 2005, and two days later, filed the transcript.
{¶ 8} The trial court conducted a de novo review. It overruled Larkett's objections, and adopted the magistrate's recommendation that A.V.'s interests would best be served by awarding legal custody to Siby, with visitation to Larkett as agreed by the parties. It is from that judgment Larkett appeals, raising the following three assignments of error:
ASSIGNMENT OF ERROR I: THE COURT ERRED IN GRANTING CUSTODY OF ALAYSIA VANLER TO FOSTER PARENTS RATHER THAN GRANTING CUSTODY TO MARY AND WILLIAM LARKETT, QUALIFIED RELATIVES.
ASSIGNMENT OF ERROR II: THE COURT ERRED IN FAILING TO ORDER PLACEMENT OF THE CHILD WITH THE LARKETTS PENDING THE OUTCOME OF THE CASE.
ASSIGNMENT OF EERROR III: THE COURT ERRED IN REFUSING TO ALLOW ANY TESTIMONY REGARDING THE FOSTER PARENTS' RELIGION.
 {¶ 9} In her first assignment of error, Larkett contends The trial court erred in granting custody of A.V. to the Sibys when, as a relative and a "qualified custodian," she has placement priority "under law and custom in this court's determination of custody." (Larkett's brief, at 14.) Larkett argues that it is important for A.V. to know she has relatives who love her and that she was raised by her family. Larkett further asserts that A.V. is just as bonded to her family as she is to the Sibys, and notes, "there is no evidence on the record" to suggest that A.V. "would be harmed in any way by" being removed from their care. Id. at 8. Larkett also takes issue with how the Guardian Ad Litem ("GAL") discharged her duties. Specifically, Larkett alleges the GAL failed to conduct an adequate investigation as to custodial suitability, and conspired with FCCS to sabotage her chances of obtaining legal custody. For a number of reasons, we find this assignment of error lacks merit.
 {¶ 10} We begin by noting that Larkett has failed to cite to any legal authority relative to this assignment of error.[2] As such, she has not met her burden of affirmatively demonstrating error on appeal. App.R. 16(A)(7);St. Nikola Macedonian Orthodox Church v. Zoran, Summit App. No. 22666, 2006-Ohio-2561, at ¶ 21 ("`It is the duty of the appellant, not this court, to demonstrate his assigned error through an argument that is supported by citations to legal authority and facts in the record.'"), quoting State v. Taylor
(Feb. 9, 1999), Summit App. No. 2783-M; State ex rel. Montgomeryv. Gold, Franklin App. No. 04AP-863, 2006-Ohio-943, at ¶ 40, 51, 52, 94, 95; Abon, Ltd. v. Transcon. Ins. Co., Richland App. No. 2004-CA-0029, 2005-Ohio-3052, at ¶ 100 (citations omitted); Inre C.C., Franklin App. No. 04AP-883, 2005-Ohio-5163, at ¶ 80. Accordingly, we overrule this assignment of error. Even if we were to review this assignment of error, we would, nevertheless, consider it as an alternate ground for affirmance.
 {¶ 11} A trial court reviews a magistrate's decision granting legal custody under a preponderance of the evidence standard. Inre Nice, (2001), 141 Ohio App.3d 445, 455. "Preponderance of the evidence" means evidence that is more probable, more persuasive, or of greater probative value. Id. An appellate court reviews legal custody determinations for an abuse of discretion. Bechtolv. Bechtol (1990), 49 Ohio St.3d 21, syllabus. The term "abuse of discretion" implies more than an error of law or judgment, it connotes an attitude on the part of the trial court that is arbitrary, unreasonable, or unconscionable. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217. Thus, if the court's decision regarding legal custody is not supported by competent, credible evidence, then it is unreasonable and we may reverse it.In re Nice, supra, at 455. We also note that the knowledge gained by the trial court through the observation of witnesses and parties cannot be conveyed to a reviewing court by a printed record. In re Rowe, Franklin App. No. 03AP-111, 2003-Ohio-6062, at ¶ 8 (citation omitted). Accordingly, the reviewing court is guided by the presumption that the trial court's findings were correct.
 {¶ 12} Once a child is adjudicated abused, neglected, or dependent, a juvenile court may award legal custody of the child to any parent or person who files a motion requesting legal custody. R.C. 2151.353(A)(3). In making the custody determination, the juvenile court must consider the best interest of the child. In the Matter of Rowe, supra, at ¶ 8; In theMatter of Bradford, Franklin App. No. 01AP-1151, 2002-Ohio-4013, at ¶ 29.
 {¶ 13} In this case, the evidence demonstrated that both Siby and Larkett would properly care for A.V. and make suitable custodians. Given that they were on equal footing as to suitability, the issue before the trial court was whether A.V.'s interests would best be served by removing her from the Sibys, with whom she has lived since birth and have held the same place in her emotional life and fulfilled the same socializing functions as biological parents or relatives, and placing her with the Larketts, her paternal relatives, because they are her biological family. In concluding that it would be in A.V.'s best interest to remain with the Sibys, the court found stability and continuity of care to be decisive factors. It explained:
* * * By all accounts, [A.V.] is a happy healthy child. Mrs. Siby indicated that she would like for [A.V.] to maintain her home with them, primarily because they love her as she were their own, but also because [A.V.] is more familiar with their home and needs continuity and a sense of where she belongs. She noted the [A.V.] is a bit confused about her situation and calls "everyone mommy," including her babysitter. She would support ongoing monthly visits with the Larketts.
In contrast, when asked why she would be the better custodian for [A.V.], Mrs. Larkett replied that being a blood relative was of primary importance and that she wanted [A.V.] to be raised by family. Mrs. Larkett also stated that she would maintain and support [A.V.'s] contact with the Siby's.
* * *
* * * The Sibys both testified that they place a high value on maintaining contact with all of [A.V.'s] blood relatives. Mrs. Siby regularly sends pictures and updates to [A.V.'s] mother, Ms. Johnson. Mrs. Siby has assisted in transporting [A.V.] for visits with her blood relations. In like manner, the Larketts appreciate the important role the Sibys have played in [A.V.'s] life and indicated that they would support ongoing contact with them, as well as with [A.V.'s] mother and siblings.
Both the Sibys and the Larketts are financially able to care and provide for [A.V.]. Both families would make suitable custodians for [A.V.]. It is abundantly clear that both love her and are fully dedicated to her well being. Both engage in age appropriate games and fun with [A.V.] and both provide proper care for her. Both have adequate housing for [A.V.].
[A.V.] has lived with the Sibys all of her two and a half years of life and, based upon the testimony, the court finds that the child is strongly bonded with the Siby's as her parents. The Sibys have completely rearranged their lives for [A.V.'s] benefit.
(Decision and Entry dated August 9, 2005, at 11-13.)
 {¶ 14} The gravamen of Larkett's argument is that the trial court erred by not exalting placement with biological family above all other considerations. The premise of this argument, however, is flawed because it presupposes a preference in favor of biological family in determining legal custody, when, in fact, none exists. See, e.g., In re T.W., Cuyahoga App. No. 86084,2005-Ohio-6633, at ¶ 15 ("Although a blood relationship and family unity are factors to consider when determining the best interest of a child, neither one is controlling"). Contrary to Larkett's assertion that "there are no cases which pit a fully qualified relative who has timely moved for custody of a child against an [sic] government agency that is insisting on giving the child to foster parents." (Larkett's brief, at 6.) Ohio courts, including this one, have confronted the issue.
 {¶ 15} Though not cited by the parties, we find our previous decision in In re Jones (June 8, 1995), Franklin App. No. 95AP-36, to be directly on point. That case involved a minor child, J.J., who was born while her mother was incarcerated. Prior to giving birth, however, J.J.'s mother made arrangements with James and Frankye Berry for them to take custody of J.J. Thus, like the Sibys, the Berrys had cared for J.J. since birth.
 {¶ 16} Two years later, Charlene Purdy, J.J.'s great-maternal aunt, filed a motion for alternative disposition. Ms. Purdy was already caring for another child born to J.J.'s mother, and wanted custody of J.J. An evidentiary hearing was held on the motion and the magistrate assigned to conduct the hearing rendered a report, which recommended that J.J. continue in the custody of the Berrys. J.J.'s mother, great aunt, and the GAL appointed to represent J.J. filed objections to the magistrate's report.
 {¶ 17} The trial court adopted the magistrate's report, and this court affirmed. We agreed with the trial court's analysis, and expressly recognized that "[s]tability and continuity of care have important life-long benefits for a small child." Id. We explained:
* * * [J.J.] is now three and one-half years old. Throughout her life, she has lived with James and Frankye Berry. The Berrys have served as her parents and the normal human bonding process has occurred. [J.J.'s] mother and great aunt argue that this court nonetheless should order a change of custody based upon three separate theories — an alleged constitutional right for a child to reside with a biological family; an interpretation of pertinent statutes in a way to minimize the consideration of the best interests of the child; and a theory that the lower court `ignored the obvious weight of the evidence.' The guardian adlitem argues for a similar result.
We believe that the lower court correctly considered [J.J.'s] welfare as being of primary importance and acted correctly in overruling the motion.
Addressing the three theories asserted by Ms. Jones and Ms. Purdy, we find no authority for the proposition that a great aunt has a constitutional right to custody of a child. Nor does the mother of a child have any sort of unbridled right to determine the child's care while the mother is imprisoned and the biological father is uninvolved. At the hearing on the motion, Ms. Jones acknowledged that the Berrys took good care of [J.J.]. The fact that Ms. Jones now would prefer that [J.J.] reside with a relative in Virginia was worthy of the trial court's consideration, but was properly determined to have little weight when balanced against the obvious effects upon the child that removal from the only home she has known would have on the child. No principles of constitutional law, state or federal, mandated that the trial court change custody.
* * *
* * * At age three and one-half, [J.J.] is firmly bonded to the family which has raised her. The genetic ties she has to Ms. Jones's family are far less significant than the ties which have developed during three and one-half years of nurturing with the Berrys. * * *
* * *
* * * Although Ms. Purdy might do a good job of raising [J.J.], the Berrys are already doing so. [J.J.] is presently healthy and happy. No reason exists to disrupt [J.J.'s] life in order to place her with someone with some common genes.
In re Jones, supra. When comparing the facts in In re Jones
with those at issue here, it becomes readily apparent that there is no short supply of the facts these cases have in common.
 {¶ 18} Indeed, other Ohio appellate courts have reached the same result. See, e.g., In re Halstead, Columbiana App. No. 04 CO 37, 2005-Ohio-403 (foster parents awarded legal custody of a child who had been in their care since birth, despite the fact the relative also seeking custody was found to be a suitable custodian), citing In re Wright (July 11, 2001), Coshocton App. No. 00 CA 27 (court denied grandmother's request for legal custody even though it concluded that she would be a suitable custodian because of "the undeveloped bond" between the child and grandmother and "the destabilizing effect of removing a very young child from his foster family"); In re Huffer, Clark App. No. 2002 CA 96, 2003-Ohio-5964; In re Harris, Cuyahoga App. No. 76631 (court concluded that the best interest of the child would be served by placing her with the foster family that took care of her for over two years, as opposed to her grandmother, because the child had "developed strong bonds with the foster family with whom she has had a stable relationship for several years").
 {¶ 19} We are guided here today by our rationale in In reJones, and conclude the trial court did not abuse its discretion by finding that considerations related to stability and continuity of care were overriding factors, especially, where, as here, the child had been raised since birth by the same foster family that is seeking legal custody, and notwithstanding the fact both parties seeking legal custody appear to be suitable custodians. Accordingly, we find there was both competent, credible evidence and case law to support the trial court's decision, and overrule Larkett's first assignment of error.[3]
 {¶ 20} In her second assignment of error, Larkett contends that the trial court erred in failing to place A.V. with her prior to the final adjudication of custody. Citing to Moore v.City of East Cleveland (1977), 431 U.S. 494, 97 S.Ct. 1932,Smith v. Organization of Foster Families (1977), 431 U.S. 816,97 S.Ct. 2094, and "the custom of FCCS," Larkett argues, that these cases "are generally informally recognized in juvenile court in the case of qualified extended family members. It is the custom of FCCS and the court to place a child in agency custody with qualified relative. If FCCS has [sic] acted in accordance with law and custom, [A.V.] would have been placed with Mary Larkett in August of last year and this battle would have been unnecessary." (Larkett's brief, at 8.) We find no merit to Larkett's argument for several reasons.
 {¶ 21} First, FCCS is correct in asserting that Larkett has waived this assignment of error. The record shows that, with the exception of the first motion for legal custody filed on August 22, 2003, Larkett never requested the court place A.V. with her prior to the final adjudication of custody. It is, therefore, axiomatic that Larkett cannot complain on appeal that the trial court failed to grant a request that was never made of it. See, e.g., Leversee v. Leversee (Mar. 25, 1993), Franklin App. No. 92AP-1307 ("A party who fails to raise an issue at the trial court level is deemed to have waived the issue at the appellate level"), citing Shover v. Cordis Corp. (1991),61 Ohio St.3d 213, 220.
 {¶ 22} We also find Larkett has waived this argument by failing to properly raise this issue in her objections to the magistrate's decision. Pursuant to Civ.R. 53(E)(3)(d), "[a] party shall not assign as error on appeal the court's adoption of any finding of fact or conclusion of law unless the party has objected to that finding or conclusion under this rule." See, e.g., Buford v. Singleton, Franklin App. No. 04AP-904,2005-Ohio-753, at ¶ 6 Brown v. Zurich, 150 Ohio App.3d 105,2002-Ohio-6099, at ¶ 26. Thus, Civ.R. 53(E) imposes a duty to make timely, specific objections in writing to the trial court, identifying any error of fact or law in the magistrate's decision. O'Connor v. Trans World Servs., Franklin App. No. 05AP-560, 2006-Ohio-2747, at ¶ 8; Young v. Young, Summit App. No. C.A. 22891, 2006-Ohio-2274, at ¶ 5 ("`[U]nder Civ.R. 53(E)(3)(b), objections must be more than `indirectly addressed': they must be specific.'"), quoting Ayer v. Ayer (June 30, 2000), Hamilton App. No. C-990712. Here, the only reference to this issue in Larkett's objections (both original and supplemental) is contained in the discussion under her first objection, which concerns FCCS' alleged bad faith. (Larkett's supplemental objections, filed May 4, 2005, at 2.) We do not find Larkett's reference to this issue in her objections complies with the specificity requirements of Civ.R. 53, and the failure to do so resulted in waiver of the issue.
 {¶ 23} Second, even had Larkett properly preserved this argument, FCCS is correct in asserting that this assignment of error has been rendered moot.[4] We cannot go back in time and place A.V. with Larkett, thus, the mootness doctrine precludes our consideration of this issue because there is no relief we can grant Larkett. In re C.C., supra, at ¶ 24 ("A moot case is one in which, `a judgment upon some matter which, when rendered, for any reason cannot have any practical legal effect upon a then-existing controversy.'"). Our affirmance of the trial court's decision to award legal custody of A.V. to Siby also renders this assignment of error moot. Id.; see, also, Inre J.S., Franklin App. No. 05AP-615, 2006-Ohio-702, at ¶ 12-13;In re Bailey, Hamilton App. No. C-040014, 2005-Ohio-3039.
 {¶ 24} Third, we find Larkett's reliance on Moore, supra, and Smith, supra, misplaced, as neither case involved the issues presented by this appeal. We also note that Larkett has failed to direct this court's attention to any court that has treated Moore and Smith in the manner suggested, nor has she demonstrated that an actual "FCCS custom" exists. Because Larkett failed to provide any citations to legal authorities, she has not met her burden of affirmatively demonstrating error on appeal. App.R. 16(A)(7); State ex rel. Montgomery v. Gold, supra.
 {¶ 25} For the reasons discussed above, we overrule Larkett's second assignment of error.
 {¶ 26} In her third assignment of error, Larkett contends the trial court erred in overruling her objection to the magistrate's report that concerned the magistrate's curtailment of her cross-examination of Siby as to her and her husband's religious practices on the basis of relevancy. According to Larkett, she should have been allowed to pursue this line of questioning because the "religion of foster parents is relevant to any custody determination." (Larkett's brief, at 10.) In briefing, she explains:
The Sibys are Moslem and [A.V.'s] family is Christian. Counsel for the Larkett's attempted to question the Sibys about their religious practices to determine how they may affect [A.V.] and if in fact she is being indoctrinated into their faith while in foster care. Although this is clearly relevant to this case, the magistrate refused to allow any questioning at all about this, stating that it did not effect the child's best interest.
The differing religions here make [the magistrate's decision] unworkable. The Sibys do not allow [A.V.] to eat pork, the Larketts allow her to have it. Because the magistrate refused to allow any questioning, counsel for the Larketts was unable to determine what happens when [A.V.] eats pork at the Larketts and then goes back to the Sibys `unclean' since she has eaten forbidden food. Many issues will arise due to this religious difference.
 {¶ 27} We begin our discussion by reviewing the testimony at issue under this assignment of error.
Q. Okay. There was some names on some documents I found out I thought was his mother apparently not. And what is Mr. Siby's religious affiliation.
A. We're Muslims.
Q. Okay. Are you a Muslim also?
MAGISTRATE SANCHEZ: I'm gonna a —
A. Yes, ma'am.
MAGISTRATE SANCHEZ: — I'm gonna a — I mean some here — I mean, how is this relevant to — to this particular — to this particular matter? Is this a legal custody motion; —
MS. ULLMAN: Yes.
MAGISTRATE SANCHEZ: — is that correct?
MS. ROY: I will object Your Honor, —
MAGISTRATE SANCHEZ: I'm gonna —
MS. ROY: — on the basis of relevancy.
MAGISTRATE SANCHEZ: — I'm gonna sustain the objection. Let's — let's move on that's — that has no bearing on — on — on — on the a — on this legal custody motion.
MS. ULLMANN: I think it has bearing on — on how the child is going to be raised.
MAGISTRATE SANCHEZ: Basically legal custody is not PCC and the family members and including the mother, would still have a right to and — a — to — to request that the child be raised in a particular religion. So unless I'm hearing that this woman is preventing the child from practicing his or her religion then basically the Court's gonna rule that that's irrelevant. I'm going to ask you to move on. Okay.
MS. ULLMAN: Well, I was trying to figure out if that would have happened.
MAGISTRATE SANCHEZ: Okay. Well, I'm gonna ask you to move on.
(Hearing Trans. July 13, 2004, at 11-12.)
 {¶ 28} Regarding this issue in her initial objections to the magistrate's report, Larkett argued:
The Siby's [sic] are Moslem. The practice of Islam varies widely around the world as far as treatment of women and girls is concerned. Women are oppressed, killed and mutilated in Asia, Europe and Africa based upon alleged teachings of Islam. Other forms of it are milder, but still deny equal rights to girls and women. Although the United States is not perfect as far as race and gender relations, the doors are much more open than in other places and it is not in a child's best interest to be placed in an environment where she is considered second class in any way. Religion needs to be considered in determining the best interest of this young girl and the magistrate erred in refusing to allow counsel to question the foster parents.
(Objections filed by Larkett, Dec. 15, 2004, at 3.) Larkett presented a more succinct version of this argument in her supplemental objections, reducing her argument to the following: "[t]he magistrate refused to allow relevant questions about the Siby's [sic] religious practices. They are practicing Moslems and [A.V.'s] birth family is Christian." (Supplemental objections filed May 4, 2005, at 4.)
 {¶ 29} The trial court overruled Larkett's objection, and found the magistrate did not err in precluding Larkett from pursuing this line of questioning.
* * * With regard to paternal aunt's objection as to the exclusion of evidence regarding the religious preferences of the Sibys, the magistrate found that such evidence was not relevant to a determination of the best interests of the child (Tr., pg. 12). During the trial counsel for the Larketts did not argue any specific reason that the religious preference of any of the parties should have any bearing on this court's decision. In her objections, she argues that the Sibys are Muslim and as a young female child she may be subjected to treatment as a `second class citizen.' Counsel did not proffer any evidence at trial to support this contention nor did she inquire or proffer any evidence during trial indicating that the Sibys were indoctrinating [A.V.] with any religious belief at age two or that they intend to do so in the future.
(Decision and Entry dated July 6, 2005, at 4.)
 {¶ 30} As a preliminary matter, and even though no party has raised the issue in this appeal, we observe that it appears that Larkett has waived this issue. As previously explained, Civ.R. 53(E) imposes a duty to make timely, specific objections in writing to the trial court, identifying any error of fact or law in the magistrate's decision. O'Connor, supra. Further, "[o]bjections comprised of conclusory statements that contain no factual or legal support are insufficient." Young, supra, at ¶ 7. (Emphasis added.) (Citations omitted). And here, Larkett's objections are precisely that.
 {¶ 31} The scope of cross-examination is well recognized as a matter which is within the discretion of the trial court. Absent a clear and prejudicial abuse of discretion, this court will not reverse a ruling by a trial court on the scope of cross-examination. O'Brien v. Angley (1980), 63 Ohio St.2d 159,163 (citations omitted).
 {¶ 32} The magistrate did preclude counsel from cross-examining Siby regarding the level of religious observance in her home. But this was not error. Evid.R. 611(B) provides that "[c]ross-examination shall be permitted on all relevant matters and matters affecting credibility." Nonetheless, the scope of cross-examination is not unfettered. Counsel are not allowed to pursue a fishing expedition by way of cross-examination. Heltonv. Moore (C.A. 6, 1980), 617 F.2d 603. The cross-examiner must possess a good faith belief that a factual predicate for the question exists. State v. Gillard (1988), 40 Ohio St.3d 226, paragraph two of the syllabus. As explained by another court, "[t]he factual foundation requirement is meant to ensure that testimony elicited in cross-examination is not purely speculative. Proof of the examiner's good faith belief that the behavior in question has some basis in fact is required." Monroev. State of Texas (Tex.Ct.App. June 30, 1999), Austin App. No. 03-96-00738-CR (citations omitted). Upon review, we find Larkett's argument does not survive an application of these principles.
 {¶ 33} First, we agree, based on these facts, that the trial court did not err in concluding that the Sibys' religious persuasion was irrelevant because Davonna still retained parental rights, which include the right to choose the religion, if any, in which A.V. will be raised.
 {¶ 34} Second, it is clear from the record that counsel did not "possess a good faith belief that a factual predicate" existed for questioning Siby about the level of religious observance in the Siby household. Counsel for Larkett admitted to as much when she conceded she was using the cross-examination of Siby "to figure out" whether A.V. was being "indoctrinated" into Islam and/or prevented from practicing her own religion. Indeed, there is an utter lack of even a scintilla of evidence to suggest that the Sibys were forcing A.V. to practice Islam, or that she was being treated as a "second class citizen." We also find no requirement under any section of the Ohio Revised Code or in any case law that the religion of the foster family must be considered in determining a motion for legal custody, and Larkett does not point us to any.
 {¶ 35} Moreover, even if we assume that the trial court erred in finding the magistrate properly limited Larkett's cross-examination of Siby on this issue, the exclusion of her testimony was, at most, harmless error. Although Larkett asserts she has been prejudiced, she has failed to demonstrate any such showing.
 {¶ 36} Based on the foregoing, we overrule Larkett's third assignment of error.
 {¶ 37} Having addressed the three assignments of error raised by Larkett, we now turn our attention to the additional issues raised in her brief. Therein, Larkett asserts: (1) qualified-blood relatives have a substantive due process right to custody of a child that is in foster care; (2) the trial court erred by failing to consider the alleged "bad faith" of FCCS; and (3) Larkett was prejudiced by Mr. Siby's presence during the hearing, when, as a witness to the action, his attendance was improper.
 {¶ 38} At the onset, we note that while these issues are stated in Larkett's brief under the "Argument" section, Larkett does not reference the assignment(s) of error to which these issues relate, in contravention of App.R. (16)(A)(4). That rule of procedure requires an appellant to provide a "statement of the issues presented for review, with references to the assignments of error to which each issue relates." As such, we reject these arguments pursuant to App.R. 12(A). Even if we were to review this assignment of error, these arguments would fail on the merits.
 {¶ 39} First, Larkett argues that qualified-blood relatives have a substantive due process right to custody of a child that is in foster care. Larkett cites to Moore, supra, and Smith,
supra, and for the proposition that "relatives of [a] child have a substantive due process right to maintain that extended family and this is a superior right to anything that can be accorded to a contractually created entity such as a foster family." (Larkett's brief, at 8.)
 {¶ 40} We do not read Moore, supra, and Smith, supra, as standing for the proposition espoused by Larkett. We also note that Larkett failed to raise this issue in her objections, and, therefore, has waived all but plain error on appeal; the existence of which is not supported by the record. Young,
supra. Lastly, Larkett's argument is juxtaposed to the fact that, in Ohio, "relatives seeking legal custody of a child are not afforded the same presumptive rights that a parent receives as a matter of law." In re C.C., supra, at ¶ 98, citing In reZorns, Franklin App. No. 02AP-1297, 2003-Ohio-5664, at ¶ 28, citing In the Matter of Dyal (Aug. 9, 2001), Hocking App. No. 01CA11; In re Jones, supra, ("we find no authority for the proposition that a great aunt has a constitutional right to custody of a child").
 {¶ 41} Another issue raised by Larkett concerns Mr. Siby's presence in the hearing room during testimony, despite the separation of witnesses ordered by the magistrate, who allowed Mr. Siby to "testify over counsel's objections." (Larkett's brief, at 12.) We can quickly dispense with this argument because, even if there was error, Larkett has failed to demonstrate prejudice as a result of Mr. Siby's presence for attendance during trial. State v. Quinn (Mar. 30, 2001), Franklin App. No. 00AP-1155. And as correctly noted by the trial court, contrary to Larkett's assertion, her counsel did not object to Mr. Siby giving testimony after having been present in the hearing room during the proceedings.
 {¶ 42} Larkett also maintains that FCCS, as well as the GAL and FCCS caseworker, acted in concert to "manipul[ate] evidence of best interest to favor a foster parent over a qualified blood relative * * *." (Larkett's brief at 13.) According to Larkett, the alleged instances of "bad faith" include: (1) FCCS' failure to place A.V. with Larkett while the action was pending; (2) FCCS' failure to timely submit payment to the genetic testing service delayed Vanler's results for six months; and (3) the caseworker caused conflict and purposefully antagonized the Larketts by unilaterally changing the visitation location. Larkett ascribes a financial motivation to FCCS because it receives "grant money * * * for every minority child they place with a non-relative." Id. at 13. Thus, Larkett argues that the trial court should have considered these alleged instances of bad faith when engaging in its best interests analysis.
 {¶ 43} Having reviewed Larkett's argument, we find Larkett's construction of facts and interpretation of events are belied by the record. Even if Larkett's portrayal of events was accurate, she provides no persuasive argument as to why the conduct of FCCS should be attributed to Siby and factored into the best interest analysis. We further note that Larkett has failed to cite legal authority to support her argument, and, therefore, has failed to comply with App.R. 16.
 {¶ 44} For the reasons stated above, we reject these additional arguments.
 {¶ 45} Based on the foregoing, Larkett's three assignments of error are overruled on the grounds that her brief failed to comply with App.R. 16, as well as for the alternate reasons stated herein. We reject the additional issues raised by Larkett in her brief for these same reasons. Accordingly, the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, is affirmed.
Judgment affirmed.
Petree and Brown, JJ., concur.
[1] We note that on March 11, 2004, Siby filed a motion for permanent custody. At some point after filing that motion, Siby obtained new counsel, who filed the motions on May 25, 2004, and June 24, 2004.
[2] In her reply brief, Larkett asserts that "[R.C. 2151.412] itself states that the child should be placed with a qualified relative if that is in the child's best interest" and "there is a presumption that the child's best interest is best served by placement with a qualified relative." (Larkett's reply brief, at 5.) While it is true that placement with a suitable family member is but one factor to consider, it is not dispositive. As noted by the court in In re Halstead, supra, at ¶ 39 "Ohio's courts have consistently recognized that the language in R.C. 2151.412(G) is precatory, not mandatory." (citations omitted.)
[3] In the words of one treatise on the subject, "[c]ontinuity of relationships, surroundings, and environmental influence are essential for a child's normal development." J. Goldstein, A. Freud, A. Solnit, Beyond the Best Interests of the Child 31-32 (Rev. Ed. 1979). These authors explain:
Unlike adults, children have no psychological conceptions of relationship by blood-tie until quite late in their development. For the biological parents, the facts of having engendered, borne, or given birth to a child produce an understandable sense of preparedness for proprietorship and possessionness. These consi-derations carry no weight with children who are emotionally unaware of the events leading to their births. What registers in their minds are the day-to-day interchanges with the adults who take care of them and who, on the strength of these, become the parent figures to whom they are attached.
Id. at 12-13.
[4] We note that in Larkett's reply brief she contends this issue is not moot because "[i]ssues are only determined to be moot if the reviewing court reverses on other grounds." (Larkett's reply brief, at 2, fn.1.) Not only is that an incorrect statement of law, but the case cited by Larkett in support, State ex rel. Nelson v. Russo (2000),89 Ohio St.3d 227, does not stand for that proposition.