[Cite as *In re M.W.*, 2011-Ohio-6444.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 96817**

## IN RE: M.W., JR.
## A Minor Child

## JUDGMENT:
## AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD09902718

**BEFORE:** Jones, J., Boyle, P.J., and E. Gallagher, J.

**RELEASED AND JOURNALIZED:** December 15, 2011

**ATTORNEYS FOR APPELLANT**

Anita Barthol Staley
Brian Summers
7327 Center Street
Mentor, Ohio 44060


**ATTORNEYS FOR APPELLEE**

William D. Mason
Cuyahoga County Prosecutor

BY: Michelle A. Myers
Assistant Prosecuting Attorney
C.C.D.C.F.S.
3955 Euclid Avenue, Room 313E
Cleveland, Ohio 44115

LARRY A. JONES, J.:

{¶ 1} Father-appellant appeals from the judgment of the Cuyahoga County Juvenile Court granting the motion of the Cuyahoga County Department of Children and Family Services ("CCDCFS" or "Agency") for permanent custody of his son. We affirm.

I. Procedural History and Facts

{¶ 2} In February 2009, the Agency filed a complaint alleging that M.W. and his sister were neglected children and requesting a disposition of protective supervision to the

Agency. Appellant is the father of M.W. and this appeal relates to the grant of permanent custody to the Agency relative to M.W. Mother has filed a separate appeal from the trial court's judgment relative to both children.[1]

{¶ 3} In May 2009, M.W. was adjudicated neglected, but Mother retained legal custody under the protective supervision of CCDCFS. Later that same month, the Agency filed a motion to modify protective supervision to temporary custody. A hearing on the motion was scheduled, but prior to the hearing date, CCDCFS filed a motion for pre-dispositional temporary custody and requested immediate removal of M.W. from the home. The trial court held an ex-parte hearing and granted the Agency's motion.

{¶ 4} At a hearing on the Agency's pre-dispositional motion, at which Father was present with counsel, Father agreed to the Agency's motion for temporary custody and M.W. was committed to the emergency temporary care and custody of CCDCFS. Father filed a motion for legal custody or visitation.

{¶ 5} The parties later appeared for a hearing on the Agency's motion to modify protective supervision to temporary custody; Father agreed to the motion, it was granted, and the matter was continued for further review. The court subsequently held two dispositional review hearings at which it continued the temporary custody order.

{¶ 6} In May 2010, the Agency filed a motion to modify temporary custody to permanent custody. Thereafter, Mother filed a motion requesting that legal custody of

---

[1]Cuyahoga App. Nos. 96826 and 96827. We understand that this appeal is relative to M.W. only. Nonetheless, some discussion of his sister is necessary as background for the case.

the children be granted to maternal Grandmother. In March 2011, a hearing was held on the Agency's motion for permanent custody and Mother's motion for custody to be granted to maternal Grandmother. At the hearing, both Mother and Father stipulated that, under R.C. 2151.414(E), the children could not be placed with either of them within a reasonable period of time or should not be placed with either of them. Father joined in Mother's request that custody of M.W. be granted to maternal Grandmother. The sole issue for the court's consideration, therefore, was what was in the best interest of the children. The record demonstrates the following facts.

{¶ 7} CCDCFS's first involvement with the family was in October 2008 when Mother tested positive for PCP. Mother was pregnant with M.W., and he was born the following month, in November 2008. M.W. and his sister resided with Mother. Mother continued to test positive for PCP, resulting in the children being removed from her home in June 2009.

{¶ 8} The assigned social worker testified about her concerns of an award of permanent custody to Grandmother. Those concerns included Grandmother's (1) financial resources, (2) housing, (3), parental judgment, and (4) health issues. In regard to Grandmother's financial resources, Grandmother was not employed and the social worker was under the impression that she received one monthly Supplemental Social Security Income ("SSI") check to cover expenses for herself and three of her children who resided with her.[2]

---

[2]The children were 18, 17, and 16 years of age; the 17 year old was pregnant.

{¶ 9} The social worker further testified that she had concerns about the cleanliness of Grandmother's home. She described the bed that M.W.'s sister would sleep on as "not so clean," and testified that although the downstairs portion of the home had been remodeled, "there [were] issues with that." According to the social worker, Grandmother's house was appropriate for visitation, but not appropriate for 24-hour care.

{¶ 10} The social worker also testified about her concerns relating to Grandmother's parenting and judgment skills. Specifically, Grandmother is mother to 12 children, and dating back to 1993 there were approximately 30 delinquency charges against her children. Grandmother's pregnant 17-year-old daughter had issues during the 2010-2011 school year, consisting of 15 unexcused absences, several tardies, and three suspensions. Although none of Grandmother's children were ever removed from her home, CCDCFS had received 13 referrals against her. Grandmother also had ten curfew violations for her children.

{¶ 11} Further, the social worker believed that when M.W. and his sister visited with Grandmother,[3] Grandmother did not pay appropriate attention to the sister's schoolwork. This was particularly concerning to the social worker because the sister faced significant educational challenges and at the time of the final hearing she was 11 years old and in the third grade; generally, an 11 year old would be in the fifth or sixth grade. The sister was making great strides and the social worker was concerned about her regressing.

---

[3]Grandmother had visitation with the children on Monday evenings from 5:00 to 7:00 p.m.

{¶ 12} In regard to Grandmother's health, the record demonstrates that at the time of the final hearing she was 52 years old and had previously suffered a stroke. The social worker testified that Grandmother had surgery in November 2010 and appeared to "often" have medical appointments. The social worker further noted that a journal entry, in a case in which Grandmother was a defendant for a curfew violation for one of her children, stated that Grandmother was "quite ill and she's unable to monitor her 16-year old always."

{¶ 13} The children's guardian ad litem testified at the final hearing. The guardian was under the same impression as the social worker that Grandmother received one monthly SSI check to cover expenses for herself and the three children residing with her.

{¶ 14} The guardian, like the social worker, had concerns about Grandmother's house. She testified that the upstairs was in "very poor condition. * * * [O]ne room had a crib, looked like an old styled crib. I didn't feel that was appropriate for [M.W.], he is over two years old and shouldn't be in a crib. And if he were in that crib, it would be dangerous, as the crib was really small and looked to be an old style." The guardian described the bed for M.W.'s sister as consisting of "two old dirty mattresses and box spring." The guardian stated that Grandmother's pregnant daughter slept on a mattress on the floor.

{¶ 15} The foster mother, who had cared for M.W. and his sister for approximately two years, testified at the final hearing. She stated that when the children first came to

live with her the sister had a parent-like relationship with M.W. The foster mother further testified that when the sister first came to live with her at the age of nine, she was unable to read, but had since been "coming along." She explained the efforts she had taken with the sister to address her deficiencies. The foster mother expressed concern about the sister's homework not getting done when she was visiting with Grandmother.

{¶ 16} The foster mother stated that M.W. did not have any special needs and that he was a "[b]eautiful[,] happy baby" in her home.

{¶ 17} The foster mother testified that if custody of the children were granted to the Agency she would seek to adopt them. She further testified that she realized the bond the sister had with Grandmother and that she would work with Grandmother, Mother, and Father to ensure that they had involvement in the children's lives.

{¶ 18} Grandmother also testified. She stated that she receives three monthly SSI checks, one for each of the three children residing with her. She further testified that each of the three children work and that her other adult children provide her with money. Although Grandmother had had two recent overnight hospital stays, she denied having any health issues at the time and also denied being ill at the time of her curfew violation case; she described her health as "perfect."

{¶ 19} Grandmother testified as follows regarding her children's involvement with the juvenile justice system: "I don't see what that had to do with me. I was the best mother. * * * I had their back, you know, but it didn't do no good. It went in one ear and out the other. I said, I'm going to put it in God's hand because ain't nothing I can do.

They got a mind like I got a mind. They know right from wrong. It don't make me a bad parent."

{¶ 20} Grandmother testified that, for the most part, one of her children would help M.W.'s sister with her homework when she was at her house for visitation.

{¶ 21} Grandmother admitted that she failed to submit to a urine screen as requested by the Agency, and testified that she did not do so because "that snow came and it's hard for me to get out there. And then a couple of court dates came up, and I had appointments." Grandmother also admitted that she had attempted, unsuccessfully, to get custody of some of her other grandchildren.

{¶ 22} By all accounts, M.W.'s sister was bonded to both Grandmother and the foster mother. M.W. was bonded with the foster mother, but did not have the same bonding with Grandmother.

{¶ 23} On this record, the trial court determined that it was in the best interest of the children to grant permanent custody to CCDCFS.

{¶ 24} Father raises the following assignment of error for our review:

"The trial court erred in granting Cuyahoga County Department of Children and Family Services['] motion for permanent custody as such decision was against the manifest weight of the evidence and resulted in a manifest miscarriage of justice."

## II. Law and Analysis

{¶ 25} Citing R.C. 2151.412(G), Father contends that it is preferential in custody actions that children be placed with a relative. According to Father, Grandmother was a

relative who was able to appropriately provide for M.W. and the trial court erred by not granting her custody of him.

{¶ 26} R.C. 2151.412(G) governs *case plans*, and provides that "[i]n the agency's development of a case plan and the court's review of the case plan, the child's health and safety shall be the paramount concern." The statute then goes on to provide that, in developing a case plan, the agency and the court should consider that if parents are not suitable custodians for their children, extended family members are next in priority. Courts have explicitly held that this statute applies only to case plans, not custody determinations. *In re B.D.*, Ross App. No. 08CA3016, 2008-Ohio-6273, ¶30; *In re Kierra D.*, Lucas App. No. L-03-1164, 2004-Ohio-277, fn.1; *In re Harris* (Nov. 2, 2000), Cuyahoga App. No. 76631. And even then, its provisions are not mandatory. *In re Rollinson* (Apr. 27, 1998), Stark App. Nos. 97 CA 00243 and 97 CA 00206; *In re Hiatt* (1993), 86 Ohio App.3d 716, 722, 621 N.E.2d 1222; *In re Dixon* (Nov. 29, 1991), Lucas App. No. L-91-021.

{¶ 27} Relatives seeking custody of a child do not have the same rights as a natural parent. *In re Jaron Patterson*, Hamilton App. No. C-090311, 2010-Ohio-766, ¶16. No preference exists for family members, other than parents, in custody awards. Id.; *In re A.V.*, Franklin App. No. 05AP-789, 2006-Ohio-3149, ¶14; *In re Dyal*, Hocking App. No. 01CA11, 2001-Ohio-2383.

{¶ 28} In light of the above, the trial court was not required to give preferential consideration to Mother and Father's request that Grandmother be granted custody of M.W.

{¶ 29} We now consider Father's contention that the trial court's judgment was not supported by clear and convincing evidence. Before a trial court may terminate parental rights, it must find by clear and convincing evidence that: (1) it is in the best interest of the child to be placed in the permanent custody of the moving agency, based on an analysis under R.C. 2151.414(D), and (2) that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E). We only consider the former, as Mother and Father stipulated to the latter.

{¶ 30} In applying the manifest weight standard of review, our role is to determine whether there is relevant, competent and credible evidence upon which a fact finder could base its judgment. *In re Laigle/King Children* (Aug. 13, 2001), Stark App. No.2001CA00145. Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *In re P.R.*, Cuyahoga App. No. 76909, 2002-Ohio-2029, ¶15.

{¶ 31} R.C. 2151.414(D)(1) provides as follows:

{¶ 32} "(D)(1) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:

{¶ 33} "(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

{¶ 34} "(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

{¶ 35} "(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

{¶ 36} "(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

{¶ 37} "(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."

{¶ 38} The court stated the following in making its determination:

{¶ 39} "The Court has considered all of the factors.  It puts particular weight on the following factors[:] the interaction and interrelationship of the children with their

parents, siblings, relatives, and foster parents.   We have a little boy here who is two [and a half] years old.   He has lived with his foster mother for all but the first six months * * * of his life, when he was with his biological mother, who he cannot be reunified with.

{¶ 40} "I did not hear any testimony regarding any kind of bond, let alone a significant bond between [M.W.] and his maternal grandmother.

{¶ 41} "* * *

{¶ 42} "* * * basically the only parent [M.W. has] ever known is his foster mother, and [ ] every time there's a visit [with Grandmother] there's a whole houseful of people [there].   This is not like one on one kind of contact.

{¶ 43} "The Court finds that clear and convincing evidence for that factor weighs in favor of finding that best interest equals permanent custody."

{¶ 44} The court further found that: (1) M.W. was too young to express his wishes; (2) there were "legitimate concerns" about Grandmother's health; (3) there were concerns as to whether Grandmother would be able to "adequately parent" "[g]iven that the Cleveland Municipal Court found that she [could not] adequately supervise her 16 year old now, because of her health * * *."

{¶ 45} The Court additionally noted that it was "extremely bothered by the extensive Juvenile Court and Children [and] Family Services involvement of the Grandmother with her older children."   Thus, the court found that M.W. would be at "such a risk of neglect educationally and otherwise."

{¶ 46} We find the court's findings supported by competent credible evidence. Father contends that Grandmother demonstrated "long-term stability" because she lived in her house for 20 years and the guardian found the home to be "appropriate." More accurately, the guardian testified about the poor condition of Grandmother's house and her concern about M.W.'s safety in the house. Similarly, the social worker expressed concerns about Grandmother's house and, in particular, about the cleanliness of the home. According to the social worker, Grandmother's house was appropriate for visitation, but not appropriate for permanent care.

{¶ 47} In light of the above, we are not persuaded by Father's contention that Grandmother's home was appropriate.

{¶ 48} Father also contends that "[t]here was no evidence presented regarding the alleged health issues of the grandmother," and insinuates that the court only relied on the judgment entry from another case stating that Grandmother was ill. In addition to the judgment entry, which was admitted into evidence, other credible competent evidence was presented to support a finding that Grandmother was not in the best health. Specifically, at the time of the final hearing, Grandmother was 52 years old and previously suffered a stroke. The social worker testified that Grandmother had had surgery in November 2010 and appeared to "often" have medical appointments.

{¶ 49} Further, although Grandmother denied having any medical problems and described her health as "perfect," she had recently had two overnight hospital stays. On

this record, competent, credible evidence existed to render Grandmother's health as a concerning factor.

{¶ 50} Father further contends that the court's concerns about Grandmother providing for the educational needs of M.W. were unfounded because there was testimony that several of her children had been on the honor roll. Grandmother did testify that some of her kids made the honor roll, but there nonetheless was evidence presented to support the court's concern. The testimony was mainly in regard to M.W.'s sister, who had faced significant educational deficits early on, and who was working to overcome them. The testimony presented was that the sister's homework was not being completed, or correctly completed, during her visits with Grandmother.

{¶ 51} Moreover, the record also reflects that of Grandmother's nine children who were no longer living with her, only three of them had attained a high school diploma or general educational development diploma. On this record, the trial court's concern about Grandmother's ability to provide educationally for M.W. was supported by competent, credible evidence.

{¶ 52} In sum, although a trial court is required to consider each of the factors under R.C. 2151.414(D)(1) in making a determination regarding permanent custody, this court has noted that "[o]nly one of these factors needs to be resolved in favor of the award of permanent custody." *In re Moore* (Aug. 31, 2000), Cuyahoga App. No. 76942. The court's determination here was based on several factors and those findings were supported by competent, credible evidence.

**{¶ 53}** Accordingly, Father's sole assignment of error is overruled and the trial court's judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.



LARRY A. JONES, JUDGE

MARY J. BOYLE, P.J., and
EILEEN A. GALLAGHER, J., CONCUR